Case No. 22-14260-H

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

JACKSONVILLE BRANCH OF THE NAACP, et al.

*Plaintiffs-Appellees,*

v.

CITY OF JACKSONVILLE, et al.

*Defendants-Appellants,*

On Appeal from the United States District Court
for the Middle District of Florida, No. 3:22-cv-493 (Morales Howard, J.)

## APPELLANTS CITY OF JACKSONVILLE AND SUPERVISOR HOGAN'S TIME-SENSITIVE* MOTION FOR STAY

Mohammad O. Jazil**
Jason B. Torchinsky
Michael Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690
**Lead Counsel for Defendants-Appellants*

Jason R. Teal
Mary Margaret Giannini
Helen Roberson
OFFICE OF GENERAL COUNSEL
CITY OF JACKSONVILLE
117 W. Duval Street, Suite 480
Jacksonville, FL 32202
(904) 255-5100

---

*The district court issued the order at issue on Monday, December 19, 2022. *See* Attachment. The city council for the City of Jacksonville voted to appeal and seek a stay of the order at issue on Thursday, December 22, 2022. Counsel for the City filed the notice of appeal the next morning. The district court clerk transmitted the notice to this Court on Tuesday, December 27, 2022. Based on discussions with the Supervisor of Elections Hogan, a stay on or before January 6, 2023 is needed.

*Jacksonville Branch of the NAACP v. City of Jacksonville*
Case No. 22-14260-H

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Appellants certify that the following have

an interest in the outcome of this appeal:

1. American Civil Liberties Union of Florida of Florida Northeast Chapter, *Plaintiff*

2. American Civil Liberties Union of Florida, *Law Firm of Attorney for Plaintiffs-Appellees*

3. Barnum, Dennis, *Plaintiff*

4. Barnum, Eunice, *Plaintiff*

5. Beato, Michael, *Attorney for Defendants-Appellants*

6. Bennette, Matletha, *Attorney for Plaintiffs-Appellees*

7. Carswell, Haraka, *Plaintiff*

8. City of Jacksonville, *Defendant-Appellant*

9. Covington, Ayesha, *Plaintiff*

10. Dolan, Krista Ann, *Attorney for Plaintiffs-Appellees*

11. Duval County Supervisor of Elections Office, *Interested Party*

12. Florida Rising Together, Inc., *Plaintiff*

13. Florida State Conference of Branches and Youth Units of the National Association for the Advancement of Colored People, *Interested Party*

14. Genberg, Jack, *Attorney for Plaintiffs-Appellees*

15. Giannini, Mary Margaret, *Attorney for Defendants-Appellants*

16. Greenwood, Ruth M., *Attorney for Plaintiffs-Appellees*

17. Harrell, Sonya, *Attorney for Defendants-Appellants*

18. Harvard Law School Election Law Clinic, *Law Firm of Attorney for Plaintiffs-Appellees*

*Jacksonville Branch of the NAACP v. City of Jacksonville*
Case No. 22-14260-H

19.  Heard, Bradley E., *Attorney for Plaintiffs-Appellees*

20.  Hessel, Daniel, *Attorney for Plaintiffs-Appellees*

21.  Hogan, Mike, in his official capacity as Duval County Supervisor of Elections, *Defendant-Appellant*

22.  Howard, Marcia Morales, *U.S. District Court Judge*

23.  Jacksonville Branch of the NAACP, *Plaintiff*

24.  Jazil, Mohammad O., *Attorney for Defendants-Appellants*

25.  Johnson, Doug, *Map Drawer for Defendants-Appellants*

26.  Lee, Theresa J., *Attorney for Plaintiffs-Appellees*

27.  McCoy, Rosemary, *Plaintiff*

28.  McNamara, Caroline Andrews, *Attorney for Plaintiffs-Appellees*

29.  Montgomery, Ingrid, *Plaintiff*

30.  National Association for the Advancement of Colored People, *Interested Party*

31.  Northside Coalition of Jacksonville, Inc., *Plaintiff*

32.  Phillips, Jon Robert, *Attorney for Defendants-Appellants*

33.  Roberson, Helen Peacock, *Attorney for Defendants-Appellants*

34.  Roberts, Tiffanie, *Plaintiff*

35.  Singleton, Sheila, *Plaintiff*

36.  Southern Poverty Law Center, *Law Firm of Attorney for Plaintiffs-Appellees*

37.  Stephanopoulos, Nicholas, *Attorney for Plaintiffs-Appellees*

38.  Teal, Jason R., *General Counsel for the City of Jacksonville*

39.  Tilley, Daniel B., *Attorney for Plaintiffs-Appellees*

40.  Torchinsky, Jason, *Attorney for Defendants-Appellants*

41.  Warren, Nicholas, *Attorney for Plaintiffs-Appellees*

42.  Washington, Marcella, *Plaintiff*

43.  Williams, Janine, *Plaintiff*

*Jacksonville Branch of the NAACP v. City of Jacksonville*
Case No. 22-14260-H

Per Circuit Rule 26.1-2(c), Appellants City of Jacksonville and Supervisor Hogan

certify that the CIP contained herein is complete.


Dated: December 27, 2022                   */s/ Mohammad O. Jazil*
                                            Mohammad O. Jazil
                                            *Counsel for Defendants-Appellants*

## INTRODUCTION

This case concerns alleged racial gerrymandering. Plaintiffs contend that the City of Jacksonville drew city council and school board districts in a manner where race predominated, and Black voters were packed into certain districts, thereby minimizing the number of Black voices in the council and school board. The district court granted a preliminary injunction and ordered the City to redraw the affected districts. The City complied with the order; however, the district court concluded that the remedial map was also unconstitutional and ordered the use of Plaintiffs' alternative map.

At issue now is whether the district court erred in enjoining the use of the City's remedial map and mandating the use of Plaintiffs' alternative. It did. This most recent injunction is rooted in two fundamental legal errors: (1) failing to apply the presumption of good faith to the remedial map, thereby assuming the new map was tainted with the problems that marred the old map while excusing Plaintiffs from their burden of proving discriminatory intent and effect in the new map; and (2) assuming the political goal of incumbency protection was an improper, racially predominated purpose. These errors satisfy the merits-related prongs for both the *Nken* and *Purcell* stay factors. And, notably, the district court has now placed its imprimatur on a plan where one district's population is 85% Black (compared to a high of 74% in the City's remedial plan), illustrating the disconnect between what the district court attempted to do (unpacking Black voters) and what it actually did (further packing Black voters). Pitting two Black incumbents against one another undermines the goal as well.

The other stay factors are also satisfied. Rejection of a constitutional, legislatively adopted plan in favor of one drawn by Plaintiffs causes the City irreparable harm. Use of Plaintiffs' plan—the third put in place since March—also threatens to cause voter confusion and undermine voter confidence. Staying the district court's order and allowing the City's remedial plan to govern is therefore appropriate. The City and Supervisor of Elections Hogan ask for a stay **on or before January 6, 2023**, so that candidates for city council can meet the applicable qualification deadline (between noon on January 9, 2023 through noon on January 13, 2023) and election officials have ample time to prepare and mail overseas ballots for the March 21, 2023 election.

## BACKGROUND

Following the decennial census, the City engaged in a seven-month process to pass a new council and school board map. The city council passed a map on March 22, 2022, but on October 12, 2022, the district court, in a 139-page order, ruled that the map violated the Equal Protection Clause of the U.S. Constitution, specifically, city council districts 2, 7, 8, 9, 10, 12, and 14, and the overlapping schoolboard districts. Doc.53.[2] The district court principally based that decision on (1) the city council's choice to maintain existing district lines, which the district court believed were racially gerrymandered since 1991; (2) statements from city councilmembers about maintaining

---

[2] In this motion, "Doc." refers to a docket-entry number. The district court's remedial order—the order "from which relief is sought"—is attached as required by Local Rule 27-1(a)(3).

racial quotas in districts; and (3) the odd shapes of districts. *See generally id.* The district court directed the City to adopt a remedial map within twenty-seven days.[3]

The city council did so with Dr. Douglas Johnson, a redistricting expert, facilitating the process. *See* Doc.96-2 (declaration of Dr. Johnson detailing his process). Specifically, Dr. Johnson presented the city council with maps that contained contiguous and compact districts, followed clear geographic and community boundaries, and avoided pairing incumbents in the same districts. *Id.* at ¶ 32.

The remedial redistricting process took place over six publicly noticed council meetings. Doc.70-3 (Oct. 20, 2022 meeting); Doc.72-1 (Nov. 1, 2022 meeting); Doc.74-1 (Nov. 2, 2022 meeting); Doc.77-1 (Nov. 3, 2022 meeting); Doc.78-1 (Map Chat Town Hall); Doc.80-1 (Nov. 4, 2022 meeting). Councilmembers were instructed not to use race as a districting criterion. *E.g.*, 72-1 at 148-49, 170 (Nov. 1, 2022 meeting). The public was allowed to voice its opinions during the remedial redistricting process with one meeting set aside exclusively for public comment. Doc.78-1 at 43 (Town Hall).

Eventually, the city council coalesced around one of three map versions presented by Dr. Johnson—the "Maroon" map. Dr. Johnson drew the challenged districts in the Maroon map from scratch. Doc.96-2 at ¶¶ 81-89. The map maintained the partisan makeup of several districts, kept similar communities together, respected

---

[3] The City and Supervisor Hogan appealed that decision. Doc.54; No. 22-13544. They also moved the district court and this Court to stay the decision; both courts denied the motion. 2022 U.S. App. LEXIS 30883 (11th Cir. Nov. 7, 2022).

natural boundaries, and did not pair incumbents in the same district. *Id.* Ultimately, the city council passed a modified version of that map on November 4, 2022, on a sixteen-to-one vote. Doc.80-1 at 41. Of the six Black councilmembers, four voted for the remedial map, one was excused from voting, and one voted against it.[4]

Plaintiffs raised objections to the remedial map and presented three alternative maps to the district court. Doc.90. That court sustained the objections and adopted Plaintiffs' Alternative Map 3. Doc.101. The district court found that the City's remedial map, like the original map, violated the Equal Protection Clause, even though the record showed that the challenged districts were drawn from scratch, the meeting transcripts contained no purportedly race-based statements as in the original process, and the City's remedial map's districts contained better-shaped districts than the original map.

This time, the district court held that the city council's concern for protecting incumbents made this a process where race predominated, though Plaintiffs presented no evidence to that effect. *Id.* at 40. Shapes (but not the compactness measures) of the districts seemingly cut against the City, *id.* at 27, 40, with "core retention" proving fatal. *Id.* at 45. And while acknowledging common facts about the City—limitations because of population, the tendency of Black voters to live in dense communities, and the location of a river that divides the City—the district court still found that the City's

---

[4] In casting the single vote against the remedial map, this councilmember indicated that she did so because she continued to believe in the validity of the initial map previously enjoined by the district court. Doc.80-1 at 246-49, 260-61.

decision not to pair incumbents against one another had to have been racially motivated and failed to remedy the problems with the initial map. *Compare id.* at 37-38, 56, *with id.* 39 (discussing "housing patterns"), 45 n.22 (noting "the mapmakers" must contend with "tight population restrictions dictated by unchallenged districts in the south," in a City "with a large river running through the center").

Having found the remedial map unconstitutional, the district court stated that Plaintiffs' three alternative maps "address[ed] the constitutional infirmities" of the original map "on a structural level," *id.* at 49, and selected Alternative Map 3 as the map to use in upcoming municipal elections for city council and school board. *Id.* at 49-50. The district court explained how Alternative Map 3, compared to the two other alternative maps, kept certain neighborhoods together and kept some lines that mirrored the remedial map. *Id.* at 50-51. In comparing Alternative Map 3 to the remedial map, the district court only suggested that Alternative Map 3 had more compact districts than the remedial map, though commonly accepted compactness measures for the remedial map and Plaintiffs' map were nearly identical, and that Alternative Map 3 did not respect the city council's goal of protecting incumbencies. *Id.* at 49, 51-52.

The district court ordered the immediate implementation of Alternative Map 3. *Id.* at 59. It did so even though the any-part Black population in the allegedly packed districts varied by only a percentage point between the City's remedial plan (60.70%) and Plaintiffs' Alternative Map 3 (59.05%). *Compare* Doc.92-1 at 118, *with id.* at 135.

5

After consulting with the City's Office of General Counsel on December 22, 2022,[5] the City and Supervisor Hogan filed a notice of appeal the next morning. A stay before the district court was impracticable given the need for an immediate resolution. *See* Fed. R. App. P. 8(a)(2)(A)(i).

## ARGUMENT

Stays pending appeal turn on four factors:

1. the likelihood the City and Supervisor Hogan will prevail on the merits;
2. the prospect of irreparable injury to the City and Supervisor Hogan if relief is withheld;
3. the possibility of harm to Plaintiffs if relief is granted; and
4. the public interest.

11th Cir. R. 27-1. *See also Nken v. Holder*, 556 U.S. 418 (2009). These *Nken* factors do not always apply, however. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (explaining circumstances). In cases where elections are close at hand—even months away—the four stay factors are modified. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurral) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)). As adopted in *League of Women Voters of Florida v. Florida Secretary of State*, stays in election-related cases turn on:

1. whether the merits of Plaintiffs' claims aren't clearcut;
2. whether Plaintiffs will suffer irreparable harm absent the preliminary injunction;
3. whether Plaintiffs have unduly delayed bringing their action; or

---

[5] The notice for this meeting is available through the City's website at http://apps2.coj.net/City_Council_Public_Notices_Repository/20221222%20Notice%20of%20Litigation%20Shade%20Meeting%20re%20Redistricting.pdf .

4.    whether electoral changes, due to the preliminary injunction, aren't feasible and would cause significant cost, confusion, or hardship.

32 F.4th at 1372-75 (referencing *Merrill*, 142 S. Ct. at 880-81 (Kavanaugh, J., concurral)). Satisfying just one of the *Purcell* factors warrants a stay. *Id.* at 1372 n.8.

Naturally, there is an overlap between the *Nken* and *Purcell* factors, particularly the likelihood-of-success-on-the-merits stay factor and the clearcut-merits factor. So those merits-related factors are discussed together. The irreparable harm and public interest factors are also discussed together.

## I.    Seeking a stay before the district court was impractical.

Before discussing the *Nken* and *Purcell* stay factors, the City and Supervisor Hogan note that they seek a stay before this Court because "moving first in the district court would be impracticable." Fed. R. App. P. 8(a)(2)(A)(i). Impracticability turns on whether there is enough time to seek a stay before the district court. *See, e.g.*, *Gerber v. Herskovitz*, No. 22-1075, 2022 U.S. App. LEXIS 14890 (6th Cir. May 31, 2022) (discussing same). Time sensitivity in *Gonzalez v. Reno* allowed a six-year-old boy to file a stay application before this Court. No. 00-11424-D, 2000 U.S. App. LEXIS 7025, at n.4 (11th Cir. April 19, 2000). And time sensitivity exists here, too.

Supervisor Hogan will already be hard-pressed to implement any map (including the remedial map) before the March 21, 2023 election, because his preferred deadline of December 16, 2022 passed before the district court issued its order on the remedial map. Doc.100. Based on information and belief, however, Supervisor Hogan can

implement either the remedial map or the court-selected alternative if he is given direction **on or before January 6, 2023**. Because the qualifying window for candidates seeking office is between noon on January 9, 2023, through noon on January 13, 2023, a decision allowing the remedial map to remain in place would also assist candidates.

## II.    The merits-related prongs: the district court's two legal errors.

As to the merits-related prongs for *Nken* and *Purcell*, the City and Supervisor Hogan focus on two arguments for purposes of this motion for stay.

*First*, the district court erred in failing to accord the city council's remedial map a presumption of good faith. "The Supreme Court has instructed that when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature [and in this case the city council] must be presumed.'" *League*, 32 F.4th at 1373 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). In *Abbott*, this presumption of good faith required the challengers to again present evidence showing that Texas's 2013 redistricting plan was motivated by the kind of discriminatory intent animating a 2011 plan. *See Abbott*, 138 S. Ct. at 2324. So too in *North Carolina State Conference of the NAACP v. Raymond*, where discriminatory intent from a 2013 law could not be carried over into a 2018 law. 981 F.3d 295, 303-04 (4th Cir. 2020). And in *League of Women Voters*, a stay panel of this Court made clear that the

presumption of good faith precluded the district court from taking a jaundiced view of the minimal evidence actually presented to it. 32 F.4th at 1373.

Here, it is uncontested that the remedial plan was enacted through new legislation, Doc.101 at 2, using a new map drawer. Doc.96-2 at ¶ 8.[6] And it is equally uncontested that the district court did not require Plaintiffs to again prove that discriminatory intent tainted the new remedial plan as the Supreme Court required of the challengers in *Abbott*. *Compare* Doc.101, at 35-48, *with Abbott*, 138 S. Ct. at 2325; *see also Miller v. Johnson*, 515 U.S. 900, 916 (1995) (discussing what plaintiffs must prove to overcome the presumption of good faith in a redistricting case); *Veasey v. Abbott*, 888 F.3d 792, 800-02 (5th Cir. 2018) (explaining that remedial legislation should survive unless it is "itself infected with a discriminatory purpose"); *Miss. State Chpt., Operation Push, Inc. v. Mabus*, 932 F.2d 400, 406-09 (5th Cir. 1991) (same).

Even if the district court's task was only to ensure "that the remedial plan completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful," Doc.101 at 35 (citations omitted), the presumption of good faith still dictated that Plaintiffs provide evidence clearly showing that the remedial plan falls short of the constitutional mark. *See League*, 32 F.4th at 1373. Plaintiffs never did that. They never proved that discriminatory intent and discriminatory effect infected the new map.

---

[6] Plaintiffs went so far as to waive their right to take issue with Dr. Johnson's statements. Doc.96-1 at 11:15-20.

Instead, the district court simply inferred that race predominated in the drawing of the remedial map. This inference stemmed from the affected districts retaining most of their starting populations, Doc.101 at 28, which the district court took to mean that the remedial plan merely "reshuffled the Black voters *within*, *but not out of*, [the previously packed districts]," and that protecting incumbents representing those affected districts embedded the constitutional flaws. *Id.* at 37 (emphasis in original).

The district court's adverse inference stands in contrast to its recognition of other alternative explanations. The district court recognized that the city council "was not required to subordinate traditional, race-neutral criteria in an effort to artificially reduce the high [percentage of Black voters in certain districts]." *Id.* at 39. It further stated that that "housing segregation in Jacksonville is an undeniable fact," and so the high percentage of Black voters within a district can be "the natural result of housing patterns in Jacksonville," i.e., lots of Black voters living next to one another. *Id.* at 38-39; Doc.96-2 at ¶ 146. The district court even said that the city council's task was made more difficult in a city "with a large river running through the center," Doc.101 at 45 n.22, with "tight population restrictions" necessitated by the uncontested districts in the southern part of the City being unable to contribute any significant number of voters into the contested districts. *Id.*; *see also* Doc.96-2 at ¶ 25 (City's expert discussing population constraints); Doc.96-1 at 105 (population density map by Plaintiffs' expert).

In fact, the "core-retention" figures calculated by Plaintiffs' expert show core retention to be a wash on a district-by-district basis[7] between the City's remedial plan (2022-800) and the district court's selection (P3). Doc.92-1 at 113.

Case 3:22-cv-00493-MMH-LLL   Document 92-1   Filed 11/22/22   Page 113 of 140 PageID 7887

**Jacksonville, FL**
**District Core Retention**
**of Challenged Districts of Enjoined Plan**

| District | Enjoined | 2022-800 | P1 | P2 | P3 |
|---|---|---|---|---|---|
| 2 | 100.00% | 98.51% | 92.15% | 98.51% | 98.51% |
| 7 | 100.00% | 51.90% | 47.21% | 36.94% | 29.76% |
| 8 | 100.00% | 35.35% | 41.81% | 41.70% | 40.86% |
| 9 | 100.00% | 37.18% | 44.66% | 55.29% | 46.86% |
| 10 | 100.00% | 19.50% | 30.09% | 36.48% | 34.25% |
| 12 | 100.00% | 81.05% | 34.46% | 85.43% | 81.05% |
| 14 | 100.00% | 69.71% | 44.30% | 43.98% | 44.94% |

And the difference in core retention for districts 7-10—the allegedly packed districts—is nominal between the remedial plan and the court-mandated plan. *Id.* at 114. Stated differently, there is no explanation for why core retention of 88.63% for districts 7-10 is unconstitutional but 83.54% is perfectly constitutional. *Id.*

---

[7] The district court seemingly considered core retention on a collective assessment of all the affected districts rather than on a district-by-district basis. This too was in error. *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). The City and Supervisor Hogan will address this issue further during the merits briefing.

11

**Jacksonville, FL**
**District Core Retention**
**of Enjoined Plan**
**Grouped Districts 7-10 & 2-12-14**

| District | Enjoined | 2022-800 | P1 | P2 | P3 |
|----------|----------|----------|--------|--------|--------|
| 2-12-14 | 100.00% | 87.42% | 65.71% | 79.46% | 78.63% |
| 7-10 | 100.00% | 88.63% | 72.86% | 83.10% | 83.54% |

The any-part Black population in the allegedly packed districts also varies by only a percentage point between the City's remedial plan (60.70%) and court-mandated alternative (59.05%). *Compare* Doc.92-1 at 118, *with id.* at 135.

Tellingly, the alternative the district court ultimately selected includes a district where Black voters constituted 85% of the voting-age population, underscoring that the constraints on map drawers are very real and applied to all map drawers. *See Council-Adopted & Court-Ordered Maps Demographics Comparison*, available at http://apps2.coj.net/City_Council_Public_Notices_Repository/Combined%20Voter%20Counts%20and%20Percentages%2020221221.pdf.[8] And the court's alternative (unlike the City's remedial map) pits two female Black incumbents against one another.

---

[8] This Court can take judicial notice of the demographic information available on the City's redistricting website. *See, e.g.*, *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.") (collecting cases); *Pyure Brands, LLC v. Nascent Health Science LLC*, No. 18-cv-23357, 2019 U.S. Dist. LEXIS 227496, at *3 (S.D. Fla. March 4, 2019) (collecting cases for the proposition that courts can take judicial notice of information on government websites).

In sum, the district court drew the worst possible inference from the limited evidence before it; the court assumed that the city council carried over its alleged malintent from the first map into the second and again packed Black voters. The district court thus inferred bad faith in contravention of Supreme Court precedent. *See League*, 32 F.4th at 1373 (collecting cases).

*Second*, the district court treated incumbency protection as an improper racial purpose. "[I]ncumbency protection" is among the "traditional race-neutral districting principles" like "compactness, continuity, respect for political subdivisions" and "communities defined by actual shared interests." *Ala. Legis. Black Caucus v. Ala.*, 575 U.S. 254, 271 (2015) (citations omitted). Protecting incumbents only becomes improper when the evidence shows that such protection is being used as a proxy for racial preference. *See, e.g.*, *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1271-72 (11th Cir. 2002).

In this case, the district court found that the retention of the population within the affected districts made incumbency protection an improper redistricting criterion. Doc.101 at 45-47. As the district court summed it up:

> On one side of the map, District 2 had little room for adjustment because the majority of its population lives along its border with unchallenged districts, which the City Council did not want to change. *See* Johnson Decl. ¶ 29. On the other side of the map, the City Council's goal of keeping District 12 a Republican district, in the interests of its incumbent, left little room for meaningful changes there. And in the middle, the four incumbents representing Districts 7, 8, 9, and 10, lived within a four-mile radius of each other, drastically limiting the options of how to reconfigure those Districts if no one incumbent could be paired with another.

*Id.* at 45. But none of the district court's points serve as evidence that incumbency was a proxy for race. *See id.* There was no evidence to this effect either.

The district court's conclusion to the contrary then rests on the assumption that the remedial plan did not cure the defects with the original plan. But here too that assumption is evidence-free. There was no detailed *Arlington Heights* analysis (as there was with the district court's earlier order) that found discriminatory intent with the remedial map—there was no showing the Black voters remain unconstitutionally packed. There was also no direct evidence of race-based apportionment establishing incumbency as a proxy for race as there was in *Clark. See* 293 F.3d at 1267-68. There was only the legislative record and Dr. Johnson's declaration—the "credibility" of which Plaintiffs do not "contest," Doc.96-1 at 11:15-20—that showed the city council addressing the district court's initial concerns and unpacking Black voters from the affected districts in an appropriate manner. And, to be sure, the City did not have the burden of showing that its remedial map, with a preference for incumbency protection, was the "best" of "methods available" to remedy any alleged constitutional flaws. *Miss. State Chpt., Operation Push v. Mabus*, 717 F. Supp. 1189, 1192 (N.D. Miss. 1989).

Under the circumstances, incumbency protection served no purpose other than to preserve the relationships between voters and their elected officials. *See, e.g.*, Doc.80-1 at 204, 207-08, 214. The district court's conclusion to the contrary was in error.

14

### III.    Staying the district court's order would prevent irreparable harm to the City and serve the public interest.

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox, Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). That concern is heightened when elections are concerned. *See, e.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). As discussed above, the City maintains that the remedial map approved by its democratically elected councilmembers for a city of nearly a million people is constitutional. No one has shown otherwise. Failure to use this constitutional map for the March 2023 city council elections would thus cause the City and Supervisor Hogan irreparable harm.

By contrast, Plaintiffs have failed to show how the remedial map—as opposed to the initial map—would cause them irreparable harm. Nor can they, as the proposals Plaintiffs put forward as alternatives have near identical compactness numbers, Doc.92-1 at 60-63, very similar core retention numbers, *id.* at 113-14, and the court-selected alternative has a district that actually exceeds by more than ten percentage points the number of Black voters packed into a district as compared to the highest Black-percentage district in the City's remedial map. *See supra Council-Adopted & Court-Ordered Maps Demographics Comparison*. And, again, if the goal was to increase the number of

15

Black voices on the city council, then the court-mandated map fails in that regard too because it now pits two Black, female incumbents against one another.

Voter confusion and voter confidence have also become a renewed concern. The district court's preferred alternative is now the third map presented to the public for the March 21, 2023 election. If "redistricting is an inherently political task" best suited for the political branches, *Upham v. Seamon*, 456 U.S. 37, 41-41 (1982), and *Purcell* is most concerned with the risk of voter confusion and undermining voter confidence, *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006), then staying the court-drawn, third iteration of a city council map seems appropriate. This is especially so when the next council election is eighty-four days away as of the filing of this motion for stay and the difference between the City's remedial plan and the court-mandated alternative comes down to a single percentage point of the Black population in the affected districts.

## CONCLUSION

For the foregoing reasons, whether applying *Nken* or *Purcell*, the City and Supervisor Hogan ask for a stay of the district court's order and ask for permission to use the City's remedial map for all upcoming elections. Given the time constraints, they ask for an order **on or before January 6, 2023**.

Dated: December 27, 2022              Jason R. Teal
                                      General Counsel
                                      JTeal@coj.net, HDugan@coj.net
                                      Mary Margaret Giannini
                                      Assistant General Counsel
                                      MGiannini@coj.net, SStevison@coj.net
                                      Helen Peacock Roberson

Assistant General Counsel
HRoberson@coj.net,
CStephenson@coj.net
117 West Duval Street, Suite 480
Jacksonville, FL 32202
Phone: (904) 255-5100
Facsimile: (904) 255-5120

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil
Michael R. Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 391-0503
mjazil@holtzmanvogel.com
mbeato@holtzmanvogel.com

Jason B. Torchinsky
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(540) 341-8808
jtorchinsky@holtzmanvogel.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This motion complies with Rule 27(d)(2)(A) because it contains 3,913 words, excluding the parts that can be excluded. This motion also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: December 27, 2022                                  */s/ Mohammad O. Jazil*

## CERTIFICATE OF SERVICE

I filed this motion with the Court via ECF.  I also served via e-mail a copy of this motion on all counsel of record identified in the service list that follows.

Dated: December 27, 2022                                  */s/ Mohammad O. Jazil*

## E-MAIL SERVICE LIST

Nicholas Warren
ACLU FOUNDATION OF FLORIDA, INC.
336 East College Ave. Suite 203
Tallahassee, FL 32301
786-363-1769
Email:Nwarren@aclufl.Org

Bradley E. Heard
SOUTHERN POVERTY LAW CENTER
150 E. Ponce De Leon Ave., Ste. 340
Decatur, GA 30030
470-989-5426
Email:Bradley.Heard@splcenter.Org

18

Caroline Andrews McNamara
AMERICAN CIVIL LIBERTIES UNION OF FLORIDA
4343 W Flagler Street Suite 400
Miami, FL 33134
786-363-1392
Email:Cmcnamara@aclufl.Org

Daniel Hessel
HARVARD LAW SCHOOL
3085 Wasserstein Hall 6 Everett Street
Cambridge, MA 02138
917-403-4976
Email:Dhessel@law.Harvard.Edu

Daniel B. Tilley
ACLU FOUNDATION OF FLORIDA, INC.
Suite 400 4343 West Flagler Street
Miami, FL 33134
786/ 363-2700
Email:Dtilley@aclufl.Org

Jack Genberg
SOUTHERN POVERTY LAW CENTER
150 E Ponce De Leon Ave Suite 340
Decatur, GA 30030
470-708-0554
Email:Jack.Genberg@splcenter.Org

Krista Ann Dolan
SOUTHERN POVERTY LAW CENTER
P.O. Box 10788 32302
Tallahassee, FL 32302
850-688-3908
Email:Krista.Dolan@splcenter.Org

Matletha Bennette
SOUTHERN POVERTY LAW CENTER
4210 Camden Road
Tallahassee, FL 32303
850-408-4840

19

Email:Matletha.Bennette@splcenter.Org

Nicholas Stephanopoulos
ELECTION LAW CLINIC
6 Everett St
Cambridge, MA 02138
617-998-1753
Email:Nstephanopoulos@law.Harvard.Edu

Ruth M. Greenwood
HARVARD LAW SCHOOL
6 Everett St Suite 4105
Cambridge, MA 02138
202-560-0590 Email:Rgreenwood@law.Harvard.Edu

Theresa J. Lee
ELECTION LAW CLINIC
HARVARD LAW SCHOOL
6 Everett Street Suite 4105 02138
Cambridge, MA 02138
617-496-0370
Email:Thlee@law.Harvard.Edu

# Attachment

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JACKSONVILLE BRANCH
OF THE NAACP, et al.,

        Plaintiffs,

                                  Case No. 3:22-cv-493-MMH-LLL

vs.

CITY OF JACKSONVILLE, et al.,

        Defendants.

_____/

## O R D E R

    **THIS CAUSE** is before the Court on the matter of a remedial redistricting plan for the City of Jacksonville following entry of the Court's October 12, 2022 Preliminary Injunction Order (Doc. 53). In the Preliminary Injunction Order, the Court enjoined Defendants, the City of Jacksonville and Mike Hogan, in his official capacity as Duval County Supervisor of Elections (the City), from conducting any elections using the Jacksonville City Council and Duval County School Board districts enacted in Ordinance 2022-01-E (the Enjoined Plan), until entry of a final judgment in this case. See Order (Doc. 53) at 137. In light of that decision and with an election scheduled for March 2023, it became necessary to promptly implement an interim remedial plan for use in that election, and any other City Council or School Board elections to be held

before entry of a final judgment in this case. As such, the Court's Preliminary Injunction Order established deadlines for the consideration and implementation of a remedial plan.

In accordance with the Court's deadlines, the City filed a notice on November 8, 2022, in which it informed the Court that the Jacksonville City Council had approved Ordinance 2022-800-E which was signed by the Mayor on November 7, 2022. See Notice of Filing Remedial Interim Plan (Doc. 67). In Ordinance 2022-800-E, the City Council adopted an interim remedial plan for the City Council and School Board districts, "pending final approval by the appropriate court of law . . . ." See id., Att. A at 1, 34 (the Remedial Plan). As required by the Court, the City also filed "all files, data, correspondence, transcripts, and analyses relating to the enactment process, not otherwise exempt from disclosure pursuant to Florida's Public Records Law, Florida Statutes § 119, et seq." See Order at 138; Notices of Filing Documentary Materials from Remedial Interim Plan Process (Docs. 70-86).

On November 18, 2022, Plaintiffs filed objections to the City's Plan and offered three alternative interim remedial plans. See Plaintiffs' Objections to the City's Proposed Remedial Plan and Submission of Alternative Plans (Doc. 90); Notice of Filing Materials in Support of Plaintiffs' Objections to the City's Proposed Remedial Plan and Submission of Alternative Plans (Doc. 89). To address minor errors, Plaintiffs filed a corrected version of their brief and one of

their expert reports on November 22, 2022.  See Notice of Filing Corrected Fairfax Report and Corrected Remedial Brief (Doc. 92); Plaintiffs' Corrected Objections to the City's Proposed Remedial Plan and Submission of Alternative Plans (Doc. 92-2; Objections).  In the Objections, Plaintiffs assert that the City's Remedial Plan does not cure the constitutional violations that the Court found were substantially likely to exist in the Enjoined Plan.  See Objections at 1.  As such, Plaintiffs ask the Court to reject the City's Remedial Plan set forth in Ordinance 2022-800-E and adopt one of Plaintiffs' three proposed alternative interim remedial plans until entry of final judgment in this case.  See id. at 44; see also Corrected Expert Report of Anthony E. Fairfax (Doc. 92-1; Fairfax Report) at 28-30.  On November 28, 2022, the City filed a reply in opposition to the Objections and in support of Ordinance 2022-800-E.  See Defendants' Submission in Support of Interim Remedial Plan and Reply to Plaintiffs' Corrected Objections and Alternative Plans (Doc. 97; Reply).  Neither party requested oral argument or an evidentiary hearing.  Accordingly, this matter is ripe for review.

## I.      Background[1]

### A. The Enjoined Plan

On October 12, 2022, the Court entered a comprehensive Order preliminarily enjoining the implementation of the City Council and School Board redistricting maps passed by the Jacksonville City Council on March 22, 2022.   The Court found such extraordinary relief to be necessary because Plaintiffs had made a clear showing that Districts 2, 7, 8, 9, 10, 12 and 14 (the Challenged Districts) of the Enjoined Plan are substantially likely to be unconstitutional racial gerrymanders which violate the right to equal protection.  Specifically, the Court found compelling evidence that the district lines were drawn so as to artificially pack Black voters into Districts 7, 8, 9, and 10 (the Packed Districts), thereby stripping them from the surrounding Districts 2, 12, and 14 (the Stripped Districts).  Id. at 122.  Although the Court will not recount all of the evidence here, it bears noting that Plaintiffs' evidence of intentional race-based decision-making was "largely unrebutted and compelling." See Order at 134.

---

[1] The Court provides a brief summary of the Preliminary Injunction Order here but otherwise presumes the reader's familiarity with that Order, its defined terms, and the history of this case.   In addition, the Court emphasizes that Plaintiffs' request for preliminary injunctive relief was before the Court on an expedited schedule, and the factual record has not been completely developed.  Similarly, the determination of an appropriate remedy must be made on an extremely expedited basis.  Therefore, the Court's findings at this time do not necessarily reflect what may be established on a more fully developed record following a trial on these issues.  Accordingly, the determinations in this Order are expressly limited to the record before the Court at this time and should not be interpreted as a final decision on the merits.

In addition, and as significant to this remedial stage, the Court found that real and substantial harms resulted from Jacksonville's decades-long history of racial gerrymandering.  As set forth in the Order,

> by focusing on race and packing more Black voters than necessary into Districts 7, 8, 9, and 10, the [Enjoined] Plan does more than just assure minority representation on the City Council in those Districts.  It also confines the voice of Black voters to those four districts on the north and west sides of the city. Because the Black voters are pulled out of Districts 2, 12, and 14, the Enacted Plan assures that in those Districts there will not be a sufficient number of Black voters for them to have a meaningful impact on any election or a meaningful voice on any issue of concern. In addition, as Plaintiffs describe in their Declarations, dividing communities to prioritize race in the drawing of district lines undermines the quality of representation for the people living in those communities and districts.

See id. at 122-23 (emphasis added).  The Court also relied on Supreme Court precedent identifying the serious harms that stem from racial gerrymandering.  For example, the Supreme Court has found that racial gerrymandering reinforces racial stereotypes—that "regardless of their age, education, economic status, or the community in which they live," members of the same racial group "think alike, share the same political interests, and will prefer the same candidates at the polls." See id. at 124 (quoting Shaw v. Reno, 509 U.S. 630, 647-48 (1993)).  The Supreme Court has further explained that such race-based districting sends the "equally pernicious" message to elected representatives that "their primary obligation is to represent only the members of [one racial

group], rather than their constituency as a whole." Id. (quoting Shaw, 509 U.S. at 647-48).

In light of compelling evidence that the Challenged Districts likely represent unconstitutional racial gerrymanders and given the substantial irreparable harms that would result from proceeding with the March 2023 election on an unconstitutional map, the Court found that the balance of equities required entry of an injunction against the use of the Enjoined Plan. Recognizing that redistricting is primarily a legislative function, the Court returned the matter to the City's elected representatives to pass a remedial plan. The Court instructed the City that "[a]ny interim remedial plan the City enacts must not use race as a predominant factor in the design of any district unless that use of race is narrowly tailored to comply with a constitutionally permissible compelling government interest." See Order at 137-38.

## B. The Remedial Plan

In light of the Court's Order, on October 18, 2022, City Council President Terrence Freeman (At Large Group 1) created the 2022 Special Committee on Redistricting charged with obtaining "legally permissible considerations for redistricting in accordance with state, federal and case law," and with preparing a redistricting map consistent with the legal guidance to submit to the City Council. See Oct. 18, 2022 Memorandum (Doc. 70-2). The Redistricting Committee met for the first time on October 20, 2022. At this meeting, the City's

Office of General Counsel (OGC) informed the Committee that the OGC had obtained an outside redistricting expert, Douglas Johnson, President of National Demographics Corporation, to help the Planning and Development Department in developing map proposals. See 10.20.22 Mtg. Tr. (Doc. 70-3) at 7; see also Declaration of Doug Johnson (Doc. 96-2; Johnson Decl.) ¶¶ 3, 7-8. The OGC explained that Johnson would be working with both Bill Killingsworth in the Planning Department, as well as using data provided by the Supervisor of Elections.  See 10.20.22 Mtg. Tr. at 24; see also Johnson Decl. ¶ 69 ("In addition to consulting with them prior to mapping, throughout the mapping process I worked with [Killingsworth] . . . .").

Councilmember Reggie Gaffney (D7) expressed his view that Johnson should meet with councilmembers to discuss potential changes and explained that "each council person may have some institution[al] knowledge that can leverage their opinion to him making these decisions that I think is very important." See 10.20.22 Mtg. Tr. at 24-25.[2]  The Committee also heard from

---

[2] Although Gaffney's request was not addressed at that meeting, it is apparent from the transcripts that throughout the remedial mapmaking process, various councilmembers did meet individually with the mapmakers. See 11.1.22 Mtg. Tr. (Doc. 72-1 at 138-215) at 37-38 ("And I'm hearing from some of my colleagues that it sort of sounds as if you may have collaborated with, you know, others, and potentially some of us before today, to come to this conclusion of four [map proposals]."); see also Fourth Declaration of Nicholas Warren (Doc. 98-1), Ex. A: Andrew Pantazi, Jacksonville Redistricting Process Raises Questions of Sunshine Law Violations, The Tributary (Dec. 9, 2022) (listing meetings between Killingsworth and councilmembers).  The Court notes that Plaintiffs filed this news article in the record, and any others cited below, without objection from the City.  The Court considers only the factual events and direct quotes reported in the articles.

the OGC on the status of the lawsuit, the applicable legal principles, the opportunity for public comment during the remedial mapmaking process, and the legislative logistics going forward. Id. at 8-12, 13-15, 19-23, 28-29. Notably, at the meeting, the Committee did not formally adopt any criteria or recommendations to guide the redistricting process. Id. at 37-38.

The Committee held its second meeting on November 1, 2022. See 11.1.22 Mtg. Tr. (Doc. 72-1 at 138-215). At this meeting, the Committee heard from Johnson on his mapmaking process. Id. at 16-19. He provided the Committee with three map proposals, labeled Orange, Lime and Maroon, that he had generated with City staff, as well as a map proposal from Plaintiffs, which Plaintiffs referred to as the Unity Map. See Unity Map (Doc. 74-1 at 22); see also Johnson Decl., Ex. 3: Orange, Ex. 4: Maroon, Ex. 5: Lime. Johnson explained that his map proposals did not change any of the unchallenged districts, located south and east of the St Johns River, and likewise, did not change the portion of District 2 situated south of the river. See 11.1.22 Mtg. Tr. at 17. In addition, Johnson stated that the mapmakers did not "look at race at all when we were drawing the maps." Id. at 18. Rather, Johnson stated that they only looked at the racial demographics after they finished. Id.; Johnson Decl. ¶¶ 56-58. According to Johnson, because he drew the lines based on communities, freeways and neighborhood boundaries without looking at race, "we do go from four majority [B]lack, African-American districts down to three.

. . . There is essentially no way around that within the Court's order." <u>See</u> 11.1.22 Mtg. Tr. at 18.[3]

Johnson stated that in preparing potential remedial maps he looked to draw lines that would cure the issues that the Court found with the Enjoined Plan and follow traditional redistricting factors and City goals. <u>See</u> 11.1.22 Mtg. Tr. at 16-17. According to Johnson, he drew the lines based on communities, freeways, the river, and the regional boundaries for the Citizen Planning Advisory Committees (CPAC). <u>Id.</u> at 18; <u>see</u> <u>also</u> Johnson Decl. ¶ 32. In his Declaration, Johnson explains that the CPAC boundaries "divide the City into six planning districts to provide for the open and effective communication between Jacksonville residents, businesses, neighborhoods, community organizations, education institutions and City government." <u>See</u> Johnson Decl. ¶ 48, Ex. 2: CPAC Map.[4]

---

[3] Later in the meeting, Gaffney asked Johnson to identify on the proposed maps "which seat that possible minority may lose through this process." <u>Id.</u> at 32. Freeman, the chair of the Committee, quickly corrected Gaffney that "race can't be used." <u>Id.</u> at 32-33. Gaffney then rephrased his question to ask which districts were the four that Democrats would possibly maintain. <u>Id.</u> at 34. In response, the OGC pointed Gaffney to the political data printed on the map proposals. <u>Id.</u> at 34-35. Notably, councilmember Pittman later informed a local reporter that "the reduction in the Black population in one of the districts was a significant factor for her. 'Do the math,' [Pittman] said. 'You can count from four to three districts. It's a real concern for me.'" <u>See</u> Objections, Ex. 10: Andrew Pantazi, <u>City lawyer: Jacksonville doesn't need compact city council districts despite charter requirement</u>, The Tributary, Nov. 3, 2022.

[4] Despite his reference to six planning districts, Johnson identifies the following eight CPAC areas: Northwest, North, Southwest, Baldwin, Greater Arlington/Beaches, Southeast, Urban Core, and Beaches. <u>See</u> Johnson Decl. ¶ 49.

At the meeting, Killingsworth also recounted the criteria used, asserting that "[t]he consultant and I drew our maps strictly based on criteria, such as urban or rural, freeway—one side of the freeway or the other side of the freeway . . . one side of some physical structure, like a river or a creek or a tributary, and then making sure we have the right number of people in each box." See 11.1.22 Mtg. Tr. at 38. In addition, Killingsworth explained that councilmembers had been given the opportunity to meet with the mapmakers and based on these meetings they had received the following guidance: 1) keep District 12 a Republican district, 2) "separate the rural from the urban areas, if we can," and 3) Councilmember Ju'Coby Pittman (D8) asked that her district go north from her residence rather than south. Id. at 39. The OGC also offered its view of the map-drawing process stating that the map lines were drawn based on equalizing population, "and then established boundaries in terms of rural versus urban or where the incumbents live." Id. at 41.

Johnson walked the Committee through the Maroon, Lime, and Orange maps he developed, as well as Plaintiffs' Unity Map. Beginning with the Unity Map, Johnson pointed out, among other things, that the "biggest change" was to District 12 which "instead of being, kind of, a rural district up there, now combines—comes all the way in—coming and getting to the Sherwood Forest area. And if you know the area, William Raines High School, those end up in

-10-

District 12 and then extend all the way out to the west and southwest corners of Jacksonville." See id. at 19.

Johnson next discussed his choices in drafting the Maroon map. He moved from district to district explaining his rationale for the borders of each, noting places where he connected similar neighborhoods, followed the CPAC boundaries, or made adjustments for population reasons. Notably, he explained that he kept each councilmember in a separate district, regardless of whether that councilmember was subject to term limits or planning to run for office again. Id. at 21. According to Johnson, this focus on incumbency explains the elongated shape of District 9, as well as the need to wrap District 10 around it. See id. at 21. As to the peculiar shape of District 14, he explained that the inland Argyle Forest and Chimney Lakes neighborhoods are joined with District 14, which is otherwise a riverfront district, primarily for population reasons. Id. at 22. In the Trout River area between Districts 8 and 10, he noted that this is "where the incumbents live" such that there was a need to be "sure not to pair anybody so they can run again." Id. at 23.

Johnson did the same exercise with the Lime map, explaining that it was similar to Maroon except that District 9 was more compact and the Chimney Lakes and Argyle Forest neighborhoods were divided between Districts 12 and 14. Id. at 23. As to the Orange map, this map was a variation on Plaintiffs' Unity Map. See Ordinance 2022-800-E, 2nd Rev. Ex. 1 at 19-20; see also

Johnson Decl. ¶ 79. Johnson explained that in this map, I-295 largely defines the borders between the districts. <u>See</u> 11.1.22 Mtg. Tr. at 24. According to Johnson, the Orange map has a rural District 12 and a "relatively rural District 10 also outside of 295." <u>Id.</u> at 24. In this map, unlike the others, two sitting councilmembers are paired in District 8, although one of those councilmembers is unable to run again due to term limits. <u>Id.</u> at 24-25. He also points to District 7's "odd neck where it stretches between 8 and 9," and explains that the design "is entirely part of the keeping council members in their own seats." <u>Id.</u> at 25.

The Councilmembers discussed the proposals, expressing concerns about splitting certain neighborhoods, and the impact on the candidates running for seats on the City Council. Councilmember Rory Diamond (D13) was the first to advance a particular map, expressing his support for the Maroon plan. He explained:

> Number one, I think it is good for Judge Howard and we can do this. The second thing I like about it is that it <u>pretty much maintains a lot of what we like about the original map without all of the problems that are—the unconstitutionality about it</u>. And the third reason I like it, it is <u>keeping a lot of the communities that historically are working together, still together</u>.

<u>See</u> <u>id.</u> at 43 (emphasis added). Diamond stated his opposition to Plaintiffs' map proposal because he viewed it as a partisan gerrymander with respect to District 12. <u>Id.</u> at 42. Councilmember Randy White (D12) also expressed support for the Maroon map, rejecting the Orange map because District 12 was too spread

out.  Id. at 43-44.  Councilmember Howland expressed his support for Maroon because it keeps District 12 west of I-295, and "seems more rural and in keeping the neighborhood being accurately represented." Id. at 45.  Bowman expressed his support for both Lime and Maroon but rejected Plaintiffs' map and the Orange map as "flawed." Id. at 48.

In opposition, Councilmember Tyrona Clark-Murry (D9) stated her concern about "broken up neighborhoods," such as Woodstock, which the Maroon map  divided between Districts 9 and 10.  Id. at 50.  As such, she stated her tentative support for Orange and Lime, while expressing a desire to see a "comparison of the data." Id. at 51-52.  DeFoor expressed an inclination toward Maroon and Lime, id. at 54, and Gaffney expressed support for Lime.  Id. Councilmember Al Ferraro (D2) informed the Committee that he was concerned about splitting neighborhoods and had previously spoken with Killingsworth about keeping the Oceanway and San Mateo neighborhoods in District 2.  Id. at 55.  Councilmember Sam Newby (At Large Group 5) did not indicate his support for any particular map but asked that consideration be given to the fact that a new councilmember would be taking office in a matter of days after the November 8 special election for District 7.  Id. at 57-58.  The Committee decided to move forward with the Maroon and Lime maps, id. at 58-59, and then took public comment.  Id. at 77.  Among other things, members of the public spoke about their desire to keep the Argyle Forest and Chimney Lakes communities

together, and the importance of keeping the Riverside, Avondale and Ortega neighborhoods united.

The Committee met again on November 2, 2022. <u>See</u> 11.2.22 Mtg. Tr. (Doc. 74-1 at 162-238). At this meeting, there were no new map proposals. The discussion centered on modifications that the Committee would like to see made to Johnson's map proposals. Pittman raised a concern that she had been "drawn out" of her district and requested that rather than a district that extends south from her residence, she would prefer to be in a district that moved north from her residence. <u>Id.</u> at 51-54.[5] The Committee approved Pittman's request and instructed Johnson to modify the map proposals in the manner she described. <u>Id.</u> at 58-59. On Diamond's motion, the Committee also directed Johnson to generate variations of his map proposals that put all of Riverside, Avondale, and Murray Hill together in Districts 8, 10 or 14. <u>Id.</u> at 61, 71-72. In addition, the Committee agreed that Johnson should adjust the map to address the neighborhood splits in District 9 as identified by Clark-Murray. <u>Id.</u> at 66-68.[6]

---

[5] A local news article that day includes the following statement from Pittman on the matter: "'Basically, I was drawn out of my district,' councilwoman Ju'Coby Pittman said. 'And so at the end of the day, we want to make sure that we, you know, keep the neighborhoods together, because, again, it's a confusion with residents and the businesses that are in those communities.'" <u>See</u> Objections, Ex. 9: Jim Piggott, <u>City Council committee narrows down new district maps to one choice, but pushback continues</u>, News4Jax, Nov. 2, 2022.

[6] In discussing District 9, the Committee heard from the OGC on the policy of protecting incumbents. The OGC explained that it is "okay to have funny looking districts" so long as the odd shape is not the result of racial considerations. <u>Id.</u> at 63-64. According to the OGC, "[i]f we can say it looks weird because we're keeping neighborhoods together or because of

At this meeting, Ferraro repeated his concern about keeping the San Mateo neighborhood in District 2.  Id. at 68.  Ferraro explained that the area is "bordered by industrial parks, railroads, Main Street, and the river," such that its placement in District 7 actually isolates the community.  Id. at 68-69. Nevertheless, at that time, the Committee did not adopt a recommendation that Johnson move San Mateo back into District 2.  Id. at 70.

At the end of the meeting, Freeman stated that he was "slightly troubl[ed]" by Johnson's earlier representation that the number of "minority access seats" would drop to three.  See 11.2.2022 Mtg. Tr. at 75.  In response, Johnson explained that on all the map proposals the number of Black-majority districts drops from four, to three, but clarified that "there's a lot of debate about the effective number and 41 percent and all of that."  Id.  By effective number, Johnson means the percentage of Black voters in a district necessary for the district to likely elect the candidate of choice of those voters.  See Johnson Decl. ¶ 62.  Notably, at the liability stage of these proceedings, Plaintiffs submitted an expert report in which the expert found the effectiveness number to be a Black Voting Age Population (BVAP) of about 41%.  See Preliminary Injunction Order at 57-58 ("According to the Walker Report, the level of [BVAP] on average that would be necessary to allow Black voters to elect the candidate of their

---

republicans vers[us] democrats or to keep an incumbent in their district, that's perfectly okay." Id. at 64.

choice was 41 percent."). The City appears to question the validity of this number but has never conducted the requisite analysis itself. Indeed, despite having been retained in July of 2022, Johnson maintains that he did not have enough time to do an analysis under the Voting Rights Act (VRA) and, while critiquing the methods of Plaintiffs' experts, does not present his own estimate of the effectiveness number. See Johnson Decl. ¶¶ 59-61, 64, 223-27.

The following day, November 3, 2022, the Committee held its third meeting. See 11.3.22 Mtg. Tr. (Doc. 77-1 at 143-264). At the outset of the meeting, in response to some of the public comments, the OGC addressed the Council on the subject of VRA compliance. See 11.3.22 Mtg. Tr. at 7. The OGC explained that while the OGC believes there are problems with Plaintiffs' VRA analysis, Johnson had analyzed all of his map proposals under Plaintiffs' VRA parameters and found them to be in compliance. Id. at 8-9. Specifically, Johnson explained that:

> these analyses try to look at a percentage that a district needs to be in a given protected class in order for the voters of that particular class to elect their preferred candidates. And so their report sets those percentages. And, as you just heard, the districts in all of these maps meet those percentages. So if you do accept their proposal -- or their Voter's Act analysis, they are legal with their analysis in all of these maps.

See id. More specifically, in his Declaration, Johnson explains that although he has "many questions on the methodology and accurateness" of Plaintiffs' expert reports, he used the 41% "effectiveness" number from the Walker Report to

analyze whether his maps complied with Plaintiffs' VRA analysis.  See Johnson

Decl. ¶ 64; see also Preliminary Injunction Order at 57-58 (discussing the

Walker Report).[7]

At this meeting, in response to the directives from the day before, Johnson

presented three new map proposals: Maroon IIA, Maroon IIB, and Maroon IIC.

See Johnson Decl., Ex. 6.  Each of the maps in this series moved District 8 to

the north as Pittman requested, removed the long neck in District 9, and

entirely relocated District 7 to the south of the map.  The A version united

Avondale, Riverside, and Murray Hill into District 14, with Argyle Forest and

Chimney Lakes mostly united in District 7, although a small portion of Argyle

Forest remained in District 14.  See 11.3.22 Mtg. Tr. at 16.  The B version united

Avondale and Riverside, but not Murray Hill, in District 14, and included most

of Argyle Forest and Chimney Lakes in District 14.  Id. at 17-18.  Last, the C

version united Riverside, Avondale, and Murray Hill in District 9, and placed

most of Argyle Forest and Chimney Lakes in District 14.  Id. at 18.[8]

---

[7] The Court notes that the Enjoined Plan also satisfied Plaintiffs' VRA analysis, but this is not a VRA case.  The concern here has never been whether Districts 7, 8, 9, and 10 had a sufficiently large Black Voting Age Population (BVAP) to satisfy the VRA, but the degree to which those Districts, due to intentional racial gerrymandering, had BVAP percentages far in excess of what the VRA required.  Neither Johnson nor the OGC ever publicly address that more salient point with the Council.

[8] At the meeting, Johnson noted that a small change was made to the border of District 9 in this map to cross Martin Luther King Jr Parkway and pick up areas from District 10 "just to ensure that the map stay[s] safe under the Voter Rights Act."  Id. at 18-19.  He did not elaborate on what he believed was "safe" for purposes of the VRA, nor did he identify the shift in the percentage of Black voters accomplished by this change.  In his Declaration, he explains

-17-

After hearing public comment, the Committee then discussed these options, beginning with a motion from Diamond to move forward with Maroon IIC.  Id. at 52.  Diamond explained that he supported Maroon IIC because it addressed the public concern for unifying Riverside and Avondale, keeps the Argyle Forest area together in District 14, creates compact Districts 7 and 9, keeps District 12 as "kind of historic Westside Jacksonville," and then, other than correcting a minor issue in District 3, see infra note 12, leaves the rest of the map the same.  See 11.3.22 Mtg. Tr. at 52-53.  He emphasized that "we didn't use race at all in this," and mentioned that he was open to further discussion on moving San Mateo back into District 2.  Id. at 53.  In response, Newby expressed his concern with the relocation of District 7 from the north to the south and its impact on the candidates running for that seat in the November 8 special election.  Id. at 54-55.  He believed such candidates should be given the same incumbency protection given to District 9 representative Clark-Murray who was elected to her seat in August.  Id. at 55. Bowman shared Newby's concerns about District 7 but expressed his support for Maroon IIC.  Id. at 56.

Gaffney then spoke in strong opposition to the Maroon II series and the relocation of District 7.  He stated:

> I'm not sure why you-all are treating me as though I am not a
> Council person.  I am still elected.  And like Councilman Newby

that by making this adjustment he was "able to keep District 9 above 50 percent Black, thus providing a small increase in the defensibility of the plan against a potential Section 2 challenge if a majority-minority district were to be required."  See Johnson Decl. ¶ 109.

> said, we still have a person that represents District 7. I'm no
> different than none of you-all. I'm still elected and I deserve the
> same respect. I have a district—I've been a district member for 30
> years.

See id. at 57. He stated his view that the Committee should "have enough

respect to ensure that all elected people at least have the opportunity to rerun."

Id. at 58.[9]  Although he had not initially supported it, Gaffney asked the

Committee to consider Plaintiffs' Unity Map. Id. at 58, 60.

Later on in the meeting, Cumber also raised "serious concerns" about

Maroon IIC. Id. at 69.[10]  Her concerns included the complete "revamp[ing]" of

all the districts between the Maroon and the Maroon II series, and the division

of "the downtown overlay" between three districts. Id. at 69. She opposed the

separation of the Ortega area from Riverside and Avondale, as well as a split in

the Springfield neighborhood. Id. at 70. And, Cumber expressed her agreement

with Newby's concerns over the complete relocation of District 7 when "in less

---

[9] Notably, due to term limits, Gaffney was not eligible to run for reelection in District 7 when he gave this speech. However, his son, Reggie Gaffney Jr. was one of the two candidates in the November 8 run-off election to fill that seat. See Objections, Ex. 11: Andrew Pantazi, Jacksonville City Council passes new district map after racial gerrymandering ruling, The Tributary, Nov. 7, 2022.

[10] Prior to Cumber's remarks, Ferraro again advocated for moving San Mateo back into District 2, and received support from Newby and Diamond. Id. at 60-61. Johnson explained that this change could be easily accomplished by switching areas on the border of Districts 7 and 2, so "it wouldn't rip up other districts" and could be done on any version of the Maroon map. Id. at 62-63. DeFoor offered her preference for Maroon II A, B, and C in that order, and thanked the committee for reuniting Riverside and Avondale. Id. at 67. Clark-Murray stated her support for Maroon IIB. Id. at 68-69.

than a week there is going to be a Council member elected to a district he doesn't have." Id.

Following Cumber's remarks, the Committee discussed the impact of redistricting on the candidates running for District 7 in the November 8 election and the OGC explained that "whoever wins in the election next Tuesday is going to represent the existing Distict 7 as it exists today but will be out of their district come March and May." Id. at 76. At this point, the initial support for Maroon IIC largely evaporated based on concerns about the impact on the candidates running for District 7, as well as the map's division of the Springfield neighborhood between districts. Eventually, the Committee decided to return to the original Maroon map but instructed the mapmakers to modify the map to place Riverside and Avondale in District 10, and San Mateo in District 2. See id. at 103. The return to the original Maroon map prompted Pittman to repeat her concerns with that map, specifically, her view that she was "losing, you know, a lot of the areas that represent, you know, population." Id. at 105. She asked the mapmakers to look again at ways to move her district to the north and alleviate her concern that she was "drawn out of [her] district." Id. at 108. Gaffney later proposed a potential resolution to Pittman's concerns by simply having Districts 7 and 8 swap places. Id. at 113-14.

Toward the end of the meeting, the Committee returned to its discussion of what consideration should be given to candidates, both in terms of the two

candidates running for District 7 in the November 8th election, as well as those

raising money to run in the March election.  Clark-Murray asked what the law

required on this point and the OGC responded by explaining that there is no

legal requirement that incumbents or candidates be given any consideration, it

is solely a policy decision.  Id. at 117.  He explained that "early in the process,

the Council made the policy decision that we don't want to write anybody out of

their districts."  Id. at 118.  According to the OGC:

> It's the policy of this City Council during this redistricting process
> to make that a priority.  So I don't want to say that it's a city policy,
> because it can change.  I mean, next time they might not worry
> about it.  But for this particular one, those were the marching
> orders that we were given in terms of preparing maps and what
> information is included on those maps.

Id. at 118-19 (emphasis added).

The evening of November 3, 2022, the City Council held a town hall

meeting at which members received public comment on the map proposals and

redistricting process.  Although the Court will not attempt to summarize all of

the comments made, the Court notes that a number of people expressed their

opinion that San Mateo should remain in District 2, and that Springfield should

not be divided.  See 11.3.22 Town Hall Mtg. Minutes (Doc. 78-1 at 4-7).  In

addition, the record shows that the City Council received a large number of

emails sent to a redistricting email address put in place up for this process.

Among other things, many of those emails refer to the San Mateo and

Springfield neighborhoods, as well as the need to keep Riverside and Avondale united.

On November 4, 2022, the City Council met with the goal of enacting an interim remedial map. See 11.4.22 Mtg. Tr. (Doc. 80-1 at 41-265). The meeting lasted over six hours, and at its conclusion, the Council passed a version of the Maroon map, identified as Maroon IIIE-Fix, on a vote of 16-1. The meeting began with a presentation from Johnson on six new variations of the Maroon map, labeled Maroon IIIA-F, based on Committee recommendations from the day before. See Johnson Decl., Ex. 7. Early on, DeFoor pointed out that in some of the Maroon III maps the boundary between Districts 7 and 10 was drawn in such a way that it divided the Riverside neighborhood. Johnson explained that this error was inadvertent and could easily be fixed, resulting in the Maroon IIIA, E and F "Fix" series of maps. See Johnson Decl. ¶¶ 120-21, Ex. 8.[11] As he had done in prior meetings, Johnson walked the Council through the Maroon

---

[11] The Fix was accomplished by extending District 10 all the way to I-95 so that all of Riverside is included in District 10. In addition, Johnson changed a one city block sized notch in the border of District 10 by moving it into District 7. See 11.4.22 Mtg. Tr. at 130-31. At the meeting, he explained that the change to the notch was "in order to balance all the factors we have to consider for federal law." Id. at 132. In his Declaration, Johnson explains that he made this change to provide "a small degree of protection from a potential legal challenge under Section 2 of the VRA if a majority minority district was required," while noting that it also smoothed out the border between Districts 10 and 7. See Johnson Decl. ¶ 58. Johnson does not specify how the change altered the racial percentages of these districts or otherwise explain what "degree of protection" was achieved by the change. Nor does he explain why the peculiar notch was part of District 10 to begin with.

-22-

III variations.  See 11.4.22 Mtg. Tr. at 39-46.  The variations are summarized in the following chart:

**FIGURE 3: Maroon III map options**

|  | San Pablo in D3 | Riverside/ Avondale united | San Mateo in D2 | Pittman D7/D8 Request | (Partial) Carter-Murray neighborhoods request |
|---|---|---|---|---|---|
| Maroon | No | No | No | No | No |
| **III a** | Yes | Yes | No | No | No |
| III b | Yes | Yes | Yes | No | No |
| III c | Yes | Yes | Yes | Yes | No |
| III d | Yes | Yes | No | Yes | No |
| III e | Yes | Yes | Yes | Yes | Yes |
| III f | Yes | Yes | No | Yes | Yes |

See Johnson Decl. ¶ 118, fig. 3.[12]

The City Council discussed at length the placement of San Mateo.  Some councilmembers were concerned that moving San Mateo back into District 2 was showing favoritism to a candidate who lived in that area and intended to run for the District 2 seat on the City Council in the March election.  See 11.4.22 Mtg. Tr. at 137-39.  For example, Howland pointed out that of the forty-one non-incumbent candidates currently filed to run in March, eleven of them will be affected by the changes proposed in the Maroon map.  He explained:

> We either have to make an amendment for none or all of those 11 filed candidates. Now, keep in mind, we already have made sure that incumbents are tak[en] into account and the two who have qualified for the election that's taking place next week are taken into account.

---

[12] "San Pablo in D3" refers to a change Bowman requested early in the remedial redistricting process to correct a flaw in the Enjoined Plan's boundary between Districts 3 and 11.  See Johnson Decl. ¶ 28.  The issue is minor, uncontroversial, and unrelated to this litigation.  The Remedial Plan and all of Plaintiffs' proposed plans correct the same issue.

See 11.4.22 Mtg. Tr. at 139.  However, according to Ferraro, the San Mateo issue was about where the neighborhood belonged, not the candidate.  Id. at 139-40, 98-99.  And indeed, the City Council received numerous emails and public comments in support of keeping San Mateo in District 2.  See Johnson Decl. ¶ 136.  The OGC attempted to alleviate some of the concerns about fairness to the candidates by explaining that it would ask the Court to waive the 183-day residency requirement for the March election such that any candidates drawn out of their previous district would have the opportunity to relocate and still qualify for the March election.  Id. at 144-47; see also Objections, Ex. 11: Andrew Pantazi, Jacksonville City Council passes new district map after racial gerrymandering ruling, The Tributary, Nov. 7, 2022.  After some debate on the matter, the Council decided to move forward with the Maroon IIIE-Fix map, which incorporated all of the Committee's recommended changes and kept San Mateo in District 2.  See 11.4.22 Mtg. Tr. at 175-86.[13]

---

[13] Another concern about San Mateo was that placing this area in District 2 meant that one of the candidates running for District 7 in the November election could not be included within District 7's boundaries.  Given the location of his residence in the Oceanway community, on the other side of San Mateo, he ended up in District 8.  This issue was resolved when the candidate expressed his preference for remaining in the new version of District 8 reflected in Maroon IIIE.  See 11.4.22 Mtg. Tr. at 54; see also Johnson Decl. ¶ 123.

Notably, before the Council learned of that candidate's preference to stay in District 8, Councilmember Ronald Salem (At Large Group 2) asked the mapmakers to prepare a map that would keep San Mateo in District 2, but also allow District 7 to reach into the Oceanway community and incorporate the candidate's residence.  Johnson had previously indicated that it was not possible to do both.  When Salem inquired about this, Johnson explained that it could not realistically be done because to accomplish this request "you're going to end up with a very, very narrow finger going on and cutting up through various neighborhoods as it gets

Another significant point of contention in this final City Council meeting was the placement of Riverside and Avondale, and DeFoor's view that those neighborhoods should be in District 14 with Ortega.  Indeed, the initial vote on the Maroon IIIE-Fix Map failed when DeFoor refused to support it for this reason.  See 11.4.22 Mtg. Tr. at 199, 201-02; see also Objections, Ex. 11.  Nevertheless, after the map failed, DeFoor spoke privately with the Duval County Property Appraiser and became convinced that her goal of having Riverside and Avondale united with Ortega could not be achieved.  Id. at 204-05;  see also Johnson Decl. ¶ 125; Objections, Ex. 12: Tarik Minor, Property appraiser says redrawing Riverside-Avondale district was a necessity due to growth, News4Jax, Nov. 7, 2022.  It appears this shift was abandoned because, according to the representations made at the meeting, it would result in District 9 becoming too skinny, possibly a split of Springfield, or District 12 returning to the boundaries it had in the Enjoined Plan.  See 11.4.22 Mtg. Tr. at 159, 163, 167, 191; see also Johnson Decl. ¶ 125.  Thus, after initially voting against the Maroon IIIE-Fix map, DeFoor relented and changed her vote, leading to the final passage of the map.  Id. at 204-05, 212-13, 223.  The Remedial Plan is set forth on the following page:

---

[to] one house." See 11.4.22 Mtg. Tr. at 47 (emphasis added).  In a particularly clear example of prioritizing candidates over traditional districting criteria, Salem expressed his desire to see such a map because "the two candidates that are running ought to be able to represent the district they're running for." Id. at 47-48.



See Ordinance, 2nd Rev. Ex. 3.

### C. Fairfax Report[14]

In their Objections, Plaintiffs present the Corrected Expert Report of

Anthony E. Fairfax on the Development of Comparison Maps and Tables of

---

[14] The Court notes that at this stage of the proceedings, both parties use the demographic statistic for "Any Part Black," meaning "all single race Black in addition to mix raced categories that includes Black and other races." See Fairfax Report at 7 n.5. As a result the statistics in this Order may not directly compare to those included in the Court's Preliminary Injunction Order because in that Order, the Court used data based on people who identified as Black alone, as that was the City's practice during the 2021-2022 redistricting cycle. See Austin Report ¶ 10.

Redistricting Plans for Jacksonville, Florida (Doc. 92-1; Fairfax Report). Anthony Fairfax is a demographic and mapping consultant and the CEO/Principal Consultant of Census Channel LLC. See Fairfax Report ¶ 3. Fairfax analyzed the Enacted Plan, the Remedial Plan, Plaintiffs' proposals, and other maps considered during the remedial process, and offers data comparing their population deviations, compactness measures, core retention rates, and demographics. Id. ¶¶ 14-15. Although Fairfax does not himself draw any conclusions about the maps from this data, the Court finds the data helpful in understanding the changes between the Enacted Plan and the Remedial Plan.

As to the shape of the districts, Fairfax's data shows that the Remedial Plan does improve the average compactness scores of the Challenged Districts across all metrics. See Fairfax Report 59-60. And indeed, a visual examination of these districts and their silhouettes shows that many of the more egregious hooks, claws, and divots in the lines of the Enjoined Plan have been removed or regularized. Nonetheless, one cannot help but note the reptilian shape of District 9, the amoeba-like shape of District 10 wrapped around it, and District 14's retention of its odd bend following along the southern border of the county. While perhaps not bizarre in the manner of the Enjoined Plan, these unusual shapes still indicate a lack of compactness.

Turning to the demographics, the Fairfax Report shows that 88.63% of the people living in the Packed Districts under the Enjoined Plan remain in one of

those four districts under the Remedial Plan. <u>See</u> Fairfax Report at 114. Moreover, of the only 11% of residents who were moved from an Enjoined Packed District into one of the other Remedial Districts (Districts 2, 12, or 14), 47.66% of them are White, and 37.3% are Black. <u>Id.</u> at 137. This demographic split is significant because it is vastly disproportionate to the underlying demographics of the Packed Districts, which ranged from 60.57% to 70.26% Black residents.

On an individual basis, the Stripped Districts (2, 12, and 14) retain 98.51%, 81.05%, and 69.71% respectively of their populations. <u>See id.</u> at 113. In contrast, the Packed Districts (7, 8, 9, and 10) are significantly reconfigured, retaining only 51.90%, 35.35%, 37.18% and 19.50% of their prior residents. <u>Id.</u> However, collectively, both sets of Districts retain significant majorities of their prior populations. The Packed Districts retain 88.63% of their cores, and the Stripped Districts retain 87.42% of their cores. <u>Id.</u> at 114. As to the BVAP of these districts, Fairfax's data shows that District 7 increases from 59.40% to 70.63% BVAP, District 8 moves from 67.88% to 63.01% BVAP, District 9 decreases from 56.89% to 46.34% BVAP, and District 10 decreases from 58.61% to 50.06% BVAP. <u>See id.</u> at 117-18. However, overall the data shows that the BVAP of the Packed Districts remains substantially the same. Specifically, 80% of Jacksonville's BVAP lived in one of the Packed Districts under the Enjoined

Plan, and under the City's Remedial Plan, that number decreases <u>by less than</u> <u>two percent</u> (1.71%), to 78.29%.  <u>Id.</u>

## II.   Applicable Law

"[L]egislative reapportionment is primarily a matter for legislative consideration and determination."  <u>See</u> <u>Reynolds v. Sims</u>, 377 U.S. 533, 586 (1964).  Indeed, the Supreme Court has "repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt."  <u>See</u> <u>Wise v. Lipscomb</u>, 437 U.S. 535, 539 (1978).  As such, "when a federal court concludes that a . . . districting plan violates the Constitution, the appropriate [legislative] redistricting body should have the first opportunity to enact a plan remedying the constitutional violation."  <u>See</u> <u>Covington v. North Carolina</u> (<u>Covington I</u>), 283 F. Supp. 3d 410, 424 (M.D.N.C 2018) (citing <u>Reynolds</u>, 377 U.S. at 586) <u>aff'd in part, rev'd in part</u>, 138 S. Ct. 2548 (2018).  Where, as here, the legislative body enacts a new redistricting plan in an effort to remedy the constitutional violation, this plan "will then be the governing law unless it, too, is challenged and found to violate the Constitution."  <u>See</u> <u>Wise</u>, 437 U.S. at 540; <u>see also</u> <u>McGhee v. Granville</u> <u>Cnty., N.C.</u>, 860 F.2d 110, 115 (4th Cir. 1988).

Significantly, "[a] state's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause."

<u>Wise</u>, 437 U.S. at 540 (quoting <u>Burns v. Richardson</u>, 384 U.S. 73, 85 (1966)).

Thus,

> a court may not . . . simply substitute its judgment of a more equitable remedy for that of the legislative body; it may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place.

See <u>McGhee</u>, 860 F.2d at 115.  Nevertheless, the Court has the "'duty' to ensure that any remedy 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future.'"  See <u>Covington</u>, 283 F. Supp. 3d at 424 (quoting <u>Louisiana v. United States</u>, 380 U.S. 145, 154 (1965)); <u>see</u> <u>also</u> <u>North Carolina v. Covington</u> (<u>Covington II</u>), 138 S. Ct. 2548, 2553 (2018) (recognizing the district court's "own duty to cure illegally gerrymandered districts through an orderly process in advance of elections").  Indeed, "[i]n an equity case, the nature of the violation determines the scope of the remedy," and "an equitable remedy must be fashioned to address the constitutional violation established."  See <u>Miss. State Ch., Operation PUSH v. Mabus</u>, 932 F.2d 400, 406 (5th Cir. 1991); <u>see</u> <u>also</u> <u>United States v. Virginia</u>, 518 U.S. 515, 547 (1996) ("A remedial decree, this Court has said, must closely fit the constitutional violation . . . ." (quoting <u>Milliken v. Bradley</u>, 433 U.S. 267, 280 (1977))).  Thus, the Court "should not, in the name of [legislative] policy, refrain from providing remedies

fully adequate to redress constitutional violations which have been adjudicated and must be rectified." See White v. Weiser, 412 U.S. 783, 795 (1973).

### III.   The City's Remedial Plan

#### A. Summary of the Arguments

The Court must first determine whether the City's Remedial Plan is a constitutionally adequate remedial plan. Plaintiffs object to the City's Remedial Plan on the basis that it "does not cure the substantially likely constitutional violations that the Court identified" during the liability phase of these preliminary proceedings. See Objections at 1. According to Plaintiffs, the vast majority of Black voters on Jacksonville's northwest side that were packed into Districts 7, 8, 9, and 10 under the Enjoined Plan, remain packed into one of those same four Districts under the City's Remedial Plan. Id. at 12-13. And, to the extent any voters were moved from Enjoined Districts 7, 8, 9, and 10 into Remedial Districts 2, 12, and 14, Plaintiffs assert that those voters were disproportionately White. Id. at 11-12. Plaintiffs contend that by prioritizing the protection of incumbents, the City perpetuated the racial gerrymandering from the Enjoined Plan, and that partisan concerns further entrenched the preexisting gerrymandering. Id. at 13-23. In addition, Plaintiffs argue that despite the City's statements to the contrary, the remedial mapmakers did consider race in preparing the City's Remedial Plan as evidenced by their

references to the VRA, and the way they used descriptors like "urban" and "rural" to categorize certain communities. Id. at 24-27.

In its Reply, the City argues that its Remedial Plan "represents a wholesale revision of the Enjoined Plan." See Reply at 8. According to the City, the Plan "does not preserve the Challenged Districts' lines or cores as they existed in the Enjoined Plan or its predecessors." The City maintains that Johnson started from scratch in crafting the Remedial Plan and did not consider race when creating the district boundaries. Id. at 9. As such, the City contends that its Remedial Plan cures the constitutional violations identified by the Court. The City maintains that to the extent the mapmakers considered incumbency and political balance, these considerations are valid and were not "ploys" to hide racial motivations. Id. at 36. In addition, the City contends that the mapmakers did not use "rural" and "urban" as code for racial distinctions, but rather as a reference to population density. Id. at 29-30. And to the extent Johnson did look at race for purposes of the VRA, the City maintains that he did so properly "on the back-end of his map drawing process" and not as a predominant factor in his work. Id. at 31. For these reasons, according to the City, Plaintiffs fail to meet their burden of showing that race predominates the Remedial Plan. Id. at 1-2. The City therefore maintains that the Court should "deem the [Remedial Plan] constitutional and appropriate for use in future elections pending final judgment in this matter." Id. at 51.

## B. Discussion

As set forth at length in the Court's Preliminary Injunction Order, absent a showing sufficient to satisfy strict scrutiny,[15] a redistricting legislature engages in unconstitutional racial gerrymandering if "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." See Cooper v. Harris, 137 S. Ct. 1455, 1463 (2017). To prove that race was the predominant motivating factor, a plaintiff bears the burden of demonstrating that the legislature "'subordinated traditional race-neutral districting principles . . . to racial considerations.'" Bethune-Hill v. Virginia State Bd. of Elections, 580 U.S. 178, 137 S. Ct. 788, 797 (2017) (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995)). Significantly, "[a] plaintiff can rely upon either 'circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose' in proving a racial gerrymandering claim." See Covington II, 138 S Ct. at 2553.

In the liability stage of these proceedings, the Court preliminarily found that Plaintiffs had made a clear showing that they are substantially likely to succeed on their claim that race predominated the drawing of the Challenged Districts based on substantial direct and circumstantial evidence. For example, Plaintiffs presented compelling evidence that the bizarre shape and lopsided

---

[15] Throughout both the liability and the remedial phase of this lawsuit, the City has made no contention that it can satisfy strict scrutiny review. See Order at 14 n.10.

demographics of the Challenged Districts could only be explained by race.  See

Preliminary Injunction Order at 93-96.  This included precinct-by-precinct data

showing that the borders of the Challenged Districts followed racial lines, and

an expert report demonstrating that it was "statistically improbable that the

Challenged Districts would be drawn as they are absent race as a predominant

factor."  Id. at 96-98.

In addition, the Court relied on historical records showing that race had

dominated the drawing of these district lines since at least 1991.  See id. at 21-

28, 100-03.  Of particular relevance, the Court found that when the current

district lines were drawn in 2011 "race was the factor that could not be

compromised, at least with respect to the drawing of Districts 7, 8, 9, and 10.  In

other words, in 2011 race predominated the drawing of those districts."  Id. at

102-03.  Such evidence was significant because, in the 2021-2022 redistricting

cycle, the City Council decided to maintain the lines from 2011 as much as

possible in the interest of preserving district cores and protecting incumbents.

Id. at 99.   Additional evidence of what occurred during the 2021-2022

redistricting cycle, including the contemporaneous statements of key

lawmakers, and the City Council's response, or lack thereof, to public outcry,

convinced the Court that "the City Council in 2022 reenacted the 2011 lines not

despite their racial components but specifically to maintain them."  Id. at 105.

This evidence forms the "backdrop" for the Court's determination of whether the Remedial Plan "'so far as possible eliminate[s]' the discriminatory effects' of the racial gerrymander in each of the [Challenged Districts]." See Covington I, 283 F. Supp. 3d at 430 (quoting Louisiana, 380 U.S. at 154).[16] While the City would have the Court start its review of racial predominance on a clean slate, the Court is convinced that the "remedial posture impacts the nature of [the] review." Id. at 431. As such, the Court begins with substantial deference to the City's Remedial Plan, but must nevertheless ensure that the proposed remedial plan "completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." Id. at 431; Covington II, 138 S. Ct. at 2554 ("[T]he District Court had its own duty to cure illegally gerrymandered districts through an orderly process in advance of elections.") Whitest v. Crisp Cnty. Sch. Dist., ___ F. Supp. 3d ___, 2022 WL 2036315, at *3 (M.D. Ga. Apr. 28, 2022) (explaining in the VRA § 2 context that while the Court owes substantial deference to a legislative plan, any court-sanctioned remedy must nevertheless "completely remedy" the prior violation).

---

[16] The parties appear to dispute who bears the burden of proof at this stage of the proceedings. See Objections at 8; Reply at 5. The Court notes that "the Supreme Court never has addressed where the burden lies in the context of a challenge to a state redistricting plan adopted to remedy a racial gerrymander." See Covington I, 283 F. Supp. 3d at 430 n.3. However, as in Covington I, the Court need not resolve this question because regardless, the Court is convinced that the Remedial Plan does not remedy the constitutional violations as to the Challenged Districts.

The Court begins its consideration of the Remedial Plan with the circumstantial evidence of the demographics of the residents in the Challenged Districts and the shapes of those Districts. As summarized above, Fairfax presents unrebutted data that the vast majority of Black residents living in the Packed Districts under the Enjoined Plan remain in one of the Packed Districts under the Remedial Plan. And, to the extent the City Council did move some residents out of the Packed Districts and into a Stripped District, those residents were disproportionately White. In addition, the shapes of the Remedial Challenged Districts and the core retention data show that the City Council largely left the core of Districts 2, 12, and 14 unchanged while Districts 7, 8, 9 and 10, wedged between them, are significantly reconfigured but largely among themselves. While the City points to the significant changes to the boundaries of Districts 7, 8, 9, and 10, as evidence that the Remedial Plan does not perpetuate the constitutional infirmities of the Enjoined Plan, see Reply at 35, this evidence merely supports what Plaintiffs contend: that White voters largely remain in Districts 2, 12, and 14, and "Black voters are shuffled among— but not out of—the Packed Districts." See Objections at 11 (emphasis added).[17]

---

[17] While arguing that it made significant changes to the cores of the Packed Districts, the City also asserts that the Council worked to protect incumbents "to preserve the relationship between voters and their elected officials." See Reply at 38. But the first point undermines the second. As to the Packed Districts, it does not appear that the City Council sought to protect incumbents as a means of keeping them accountable to their specific constituencies because, as explained above, each of the Packed Districts individually retains a relatively low percentage of its former residents. For example, the City maintains that it

In response to this evidence, the City argues that the Court should reject Plaintiffs' attempt to analyze Districts 7, 8, 9, and 10 collectively.  See Reply at 32-33.  The City points to the principle that in conducting a racial gerrymandering analysis, the Court must consider the question of racial predominance on a district-by-district basis.  Id. at 33.  And district-by-district the City provides a race neutral rationale for the individual boundary lines.  See id. at 10-27.  But this effort to focus "on particular portions in isolation" obscures "the significance of the relevant districtwide evidence . . . ."  See Bethune-Hill, 137 S. Ct. at 800.  As explained in Bethune-Hill, while the Court considers the City's explanation for the placement of individual boundaries, it must still "take account of the districtwide context" which dictated how those boundaries would take shape.  Id.  And when considering the districtwide context, the data shows that the City redrew the lines in a manner that kept White voters in Districts 2, 12, and 14, and reshuffled the Black voters within, but not out of, Districts 7, 8, 9, and 10, such that the overall percentage of Black voters in the Packed

_____

sought to ensure that the councilmember for District 9 "could remain accountable to those constituents" with whom she had previously worked.  Id. at 38.  But District 9 retains only 37.18% of its prior residents.  See Fairfax Report at 113.  Notably, under every one of Plaintiffs' proposals, the core retention rate for that district is higher, and would thus provide more accountability for the incumbent to her constituents.  Id.  Likewise, the constituent accountability argument holds little weight in context of District 7 (Gaffney), whose incumbent was not eligible to run for re-election due to term limits.  Rather, the focus on incumbency appears to have been about ensuring that incumbents, or their preferred candidates, would not have to run against each other.  However, for the reasons discussed below, this interest, while permissible in some contexts, "cannot prevail if the result is to perpetuate" constitutional violations.  See Jeffers v. Clinton, 756 F. Supp. 1195, 1199-1200 (E.D. Ark. 1990).

Districts fell by only 1.71 percentage points.[18]  Thus, while the City is correct that it made <u>extensive</u> revisions to Districts 7, 8, 9, and 10, it appears that the City failed to make <u>meaningful</u> ones—it failed to actually remedy the effects of the racial gerrymandering discussed in the Court's Preliminary Injunction Order.  The voice of Black voters largely remains unchanged in that it is still confined to the Packed Districts that were the four historically majority-minority districts.  It is exceedingly difficult to see how repacking the same Black voters into a new configuration of the same four districts <u>corrects</u>, much less completely corrects, the harmful effects of the City's decades-long history of racial gerrymandering.

Of course, the question of what constitutes a complete remedy for unconstitutional racial gerrymandering is a complex one, and requires a delicate balance.  Here, the racial gerrymandering at issue dates back thirty years, and as a result there is no benchmark, race neutral plan, by which to determine whether the Remedial Plan has eliminated the effects of the City's prior over-emphasis on race.  And certainly, housing segregation in Jacksonville is an undeniable fact, such that it is to be expected that most Black residents in northwest Jacksonville would reside in the geographic areas that comprise Districts 7, 8, 9, and 10.  Indeed, Plaintiffs' map proposals reflect the same

---

[18] 80.00% in the Enjoined Plan – 78.29% in the Remedial Plan = 1.71 percentage points.

pattern of the majority of Black voters residing in those Districts. See Fairfax Report at 133-35. Also, the Court recognizes that the City Council was not required to subordinate traditional, race-neutral criteria in an effort to artificially reduce the high BVAP percentages in the Packed Districts. Because the line between what percentage reflects the natural result of housing patterns in Jacksonville, and what percentage represents the ongoing effects of racial gerrymandering is anything but clear, the Court must carefully consider the criteria that the City relied on in crafting the Remedial Plan.

The City maintains that the constitutional violations are cured because the Council crafted the Remedial Plan "from scratch" without relying on race. However, the race-blind criterion alone does not immunize the districts in the Remedial Plan from further review nor does it necessarily remedy the constitutional violation. See Covington I, 283 F. Supp. 3d at 434 (rejecting the argument that "the race-blind criterion immunizes the proposed remedial districts from any claim of racial gerrymandering" because "the Supreme Court long has recognized that a statute enacted by a state legislature to remedy an unconstitutional race-based election law can perpetuate the effects of the constitutional violation, and thereby fail to constitute a legally acceptable remedy, even when the remedial law is facially neutral"). The Court must also consider whether the City Council utilized otherwise legitimate redistricting criteria—such as the protection of incumbents—in a manner that prevented it

from "completely remedying the identified constitutional violation." See id. at 435. If the City relied on truly neutral redistricting criteria, the fact that the Packed Districts retain high BVAP percentages is not, in and of itself, problematic. But here, the Court finds strong evidence demonstrating that the reason the Packed Districts retain high BVAP percentages as well as some of their unusual shapes in the Remedial Plan is because the City Council prioritized criteria that were predestined to perpetuate, rather than correct, the preexisting racial gerrymandering in the City Council districts.

Specifically, the legislative history unequivocally establishes that the City's failure to unpack Districts 7, 8, 9, and 10 stems from the high priority the City placed on protecting incumbents and candidates during the redistricting process, and relatedly, maintaining the Council's partisan balance. Significantly, the BVAP percentages in the Remedial Plan are not inevitable. Plaintiffs submit three alternative remedial plans that adhere to traditional redistricting criteria equally, if not better, than the Remedial Plan, but do not maintain the same level of racial segregation. See Fairfax Report at 54-57, 60-63, 95, 133-35.[19] The primary distinction appears to be that Plaintiffs' maps do

---

[19] Indeed, even Johnson acknowledges that Plaintiffs' maps score equally if not marginally better than the Remedial Plan, at least under the traditionally recognized compactness tests discussed in the Preliminary Injunction Order. See Johnson Decl. ¶¶ 212, 215-16.

not prioritize protecting incumbents or candidates above all other criteria.  See Objections at 41-42.

At every step of the process, concerns for incumbents, and in some cases mere candidates, dictated the options that were and were not available for the Remedial Plan.[20]  Killingsworth received an instruction at the outset to keep District 12 a Republican district.  This goal led to the outright rejection of Plaintiffs' Unity Map, see 11.1.22 Mtg. Tr. at 42, and dictated which neighborhoods could and could not be included within that District.  Indeed, councilmembers took the view early on that District 12 should be a rural district and for this reason, they rejected placing what they perceived as urban neighborhoods in District 12, as Plaintiffs proposed.  The areas at issue are suburbs south of the Trout River with large Black populations.  See Unity Map (Doc. 67-1 at 23); Fairfax Report at 91-94.  Notably, these areas are encompassed by the Northwest CPAC, not the Urban Core.  See Johnson Decl., Ex. 2.  And significantly, the population densities of these neighborhoods are far below that of the urban downtown, and appear to be more akin to the densities of some majority White neighborhoods that are situated on the border of Remedial

_____

[20] In his Declaration, Johnson states that "[u]ltimately, the Committee decided to only take into consideration those incumbents who could run again and were not termed out."  See Johnson Decl. ¶ 195.  While this is true, it is important to note that the Committee instead decided to take into account the candidates who were running for the seat of the term-limited councilmember.

District 12, such as Rolling Hills, Normandy Manor, and Normandy Estates. See Fairfax Report at 91-94. The Unity Map had placed most of those White suburbs in Districts 9 and 10. Thus, it appears that in the interest of keeping District 12 rural, the City Council favored a map that placed more of these White suburbs in District 12, instead of Black suburbs of similar population densities.[21]

As between Districts 7 and 8, Pittman and Gaffney's desire to retain the core of their districts meant that District 8 was placed in the north but reached south of the Trout River to encompass Pittman's residence. And despite the fact that Gaffney was term limited, District 7 had to remain in the downtown area of Jacksonville so that part of its historic core remained intact for whichever candidate won the November 8 election. Indeed, a proposal that would have relocated District 7 to the southwest quadrant of the City, and reduced the overall percentage of Black voters in the Packed Districts by a greater margin, see Fairfax Report at 123, was abandoned largely in response to Gaffney's

---

[21] Nevertheless, District 12's eastern border in the Maroon map also follows a more logical boundary, along I-295, than what is shown in the Unity map. Thus, while concerning, the Court is not convinced that the City Council used the terms "urban" and "rural" as "code words" for Black and White, as Plaintiffs contend. Regardless, it is important to acknowledge that all those involved in the map drawing process plainly know where the majority of Black residents in Jacksonville live. This knowledge can easily manifest in other ways, such as the perception that some suburbs are rural while others are urban. See Wilson v. Jones, 130 F. Supp. 2d 1315, 1330 (S.D. Ala. 2000) (finding it unlikely that a remedial plan "could be guaranteed not to be based on the same over-emphasis on race" when drawn by an individual with "knowledge of the extent and location of the county's black population").

pleading that his district should be preserved out of respect for him and for the candidates running for his open seat.

In addition, the impact of the Council's decision to prioritize incumbency on Districts 9, 10, and 14 is plain. District 9 takes on its irregular, extended shape in order to acquire the population it needs in the I-295 corridor while also retaining the residence of its incumbent in the Woodstock area. Likewise, given the close proximity of the incumbents for Districts 8, 9, and 10, keeping each in their own district, required District 10 to wrap itself under District 8 and around District 9. Prioritization of incumbency is also the reason District 14 largely maintains the same irregular structure it had under the Enjoined Plan.



See Fairfax Report at 69 (Enjoined), 74 (Remedial). Because District 9 had to stretch into the Woodstock neighborhood to capture Councilmember Clark-Murray's residence, it could not take all of the Argyle Forest and Chimney Lakes population at its south end, such that those areas had to be united with the riverfront neighborhoods in District 14 by a narrow land bridge along the

southern border of the county.  See Johnson Decl. ¶ 88.  As an alternative, District 7 could have moved to that area without negatively impacting any incumbent eligible to run for office again, which would have allowed District 9 to shift more compactly to the north, and District 14 to consolidate more in the east.  See, e.g., Johnson Decl., Ex. 6.  But this reconfiguration in the Maroon II series of proposed maps was abandoned, largely in response to Gaffney's objection that District 7 must retain its historic core in the downtown area out of respect for him as the incumbent and concern for the new councilmember who would soon be elected to represent that District.  Thus, as Johnson explains, the odd shapes of Districts 9, 10, and 14 are solely the result of the decision to protect incumbents.

"All other things being equal, there is nothing wrong with a desire to protect incumbents.  But in the present case, all other things are not equal."  See Jeffers v. Clinton, 756 F. Supp. 1195, 1199-1200 (E.D. Ark. 1990).  Here, these individuals hold office "by virtue of their election in an unconstitutional racially gerrymandered district."  See Easley v. Cromartie, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting).  And under the circumstances of this case, the City's insistence on protecting incumbents embedded, rather than remedied the effects

of the unconstitutional racial gerrymandering described in the Court's Preliminary Injunction Order.  See Covington I, 283 F. Supp. 3d at 431.[22]

On one side of the map, District 2 had little room for adjustment because the majority of its population lives along its border with unchallenged districts, which the City Council did not want to change.  See Johnson Decl. ¶ 29.  On the other side of the map, the City Council's goal of keeping District 12 a Republican district, in the interests of its incumbent, left little room for meaningful changes there.  And in the middle, the four incumbents representing Districts 7, 8, 9, and 10, lived within a four-mile radius of each other, drastically limiting the options of how to reconfigure those Districts if no one incumbent could be paired with another.  Indeed, the City Council recognized that protection of incumbency could be accomplished only by maintaining irregular—i.e. non-compact—district shapes.[23]  Given these limitations, the City Council could not

---

[22] The Court acknowledges that, outside of the remedial context, avoiding the pairing of incumbents is recognized as a less problematic form of incumbency protection.  See Covington I, 283 F. Supp. 3d at 432-33 (citing Karcher v. Daggett, 462 U.S. 725, 740 (1983)).  But avoiding the pairing of incumbents in a state-wide redistricting plan is likely far more easily accomplished than within the confines of a single county, divided into fourteen districts, with a large river running through the center.  In the circumstances of this case, placing such a restriction on the mapmakers, who were further limited by the tight population restrictions dictated by the unchallenged districts in the south, see Johnson Decl. ¶¶ 25-27, and the proximity of the incumbent residences, all but ensured that the Remedial Plan would retain the general structure of the Enjoined Plan.  Notably, one councilmember recognized this similarity in structure and found it to be a reason favoring approval of the selection of a particular configuration (the Maroon map) as the starting point for the Remedial Plan.  See 11.1.22 Mtg. Tr. at 43.

[23] During the remedial process, at least two councilmembers, Danny Becton (D11) and Brenda Priestly Jackson (D10), raised concerns that the Council was moving forward with a map that did not appear to resolve the issues identified in the Preliminary Injunction Order.

reasonably expect that the new districts "would be free of the effects of the initial racial manipulation, even if they were re-drawn without knowledge of race." See Wilson v. Jones, 130 F. Supp. 2d 1315, 1331 (S.D. Ala. 2000). Thus, although efforts to protect incumbents may be legitimate in some circumstances, in this remedial posture and given the historical record currently before the Court, the City Council's desire to protect incumbents who had been elected to racially gerrymandered districts "must give way to its duty to completely remedy the constitutional violation." Covington I, 283 F. Supp. 3d at 433.

As discussed above, at this stage of the process, a remedy must be fashioned to address the constitutional violation identified in the Preliminary Injunction Order. That violation is the unconstitutional racial gerrymandering which packed excessive numbers of Black voters into four bizarrely shaped districts in northwest Jacksonville, limiting the voice of those voters to those four districts, and continuing the racial classification that undermines the quality of the representation of those voters. See Preliminary Injunction Order at 12, 122-23. Plaintiffs' circumstantial evidence demonstrates that the effects of the prior racial gerrymandering—the disproportionate packing of Black

---

See 11.4.22 Mtg. Tr. at 100-02, 119-21, 122-24. In response to these concerns, the OGC reassured the City Council that "weird looking districts" are okay so long as they are drawn for reasons other than race, such as to "capture an incumbent." Id. at 125. But as explained above, this fails to recognize that the location of the incumbents on the map were a function of the preexisting racial gerrymandering.

residents in Districts 7, 8, 9, and 10—remain present in the Remedial Plan. And the legislative history demonstrates that this outcome was dictated, not by neutral factors, but by the City Council's decision to prioritize incumbents elected on the basis of an unconstitutionally gerrymandered map. Despite the City's insistence that its mapmakers started from "scratch," the mapmakers were constrained from the outset by the need to separate incumbents—oddly including even those who were not eligible or had declared their intention not to run again as incumbents to be protected. By making this factor a priority, even for incumbents who were not able or intending to run again, the City all but guaranteed that the unconstitutional effects of the Enjoined Plan and its predecessors would be carried forward into the Remedial Plan. Thus, as in the <u>Covington</u> cases, the City's insistence that it did not look at racial data in drawing the Remedial Plan "does little to undermine" the Court's conclusion, based on the evidence set forth above, that the remedial districts perpetuate the unconstitutional sorting of voters on the basis of race. <u>See</u> <u>Covington II</u>, 138 S. Ct. at 2553. The City's Remedial Plan, which fails to correct the constitutional infirmity identified in the Preliminary Injunction Order, is plainly an inadequate remedy.

Because the City Council failed to enact a constitutionally appropriate remedial plan, a new plan is necessary. Unfortunately, it now becomes this Court's unwelcome burden to craft a new plan for implementation on an interim,

remedial basis.  This is so because, given the Supervisor of Election's stated deadline for the upcoming March election, there is insufficient time to return the matter to the City Council or to appoint a special master for the purpose of developing an appropriate remedial plan.  And, notably, neither party requested such alternative relief or proposed a way forward that did not require the Court to select a map.  As such, the Court turns to the task at hand, first considering whether any of the three remedial plans proposed by Plaintiffs are adequate and appropriate for adoption, and if not, whether the Court should independently devise an interim remedial plan.

## IV.   The Court's Interim Remedial Plan

"In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" White, 412 U.S. at 794 (quoting Whitcomb v. Chavis, 403 U.S. 124, 160 (1971)).  Indeed, "[w]hen faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." See Abrams v. Johnson, 521 U.S. 74, 79 (1997).  As such, the Court "should make only such changes in the jurisdictions [sic] plan as are necessary to correct the constitutional or statutory defect." See Wilson, 130 F. Supp. 2d at 1321.

Upon review, the Court finds that, unlike the Remedial Plan, all of Plaintiffs' map proposals address the constitutional infirmities of the Enjoined Plan on a structural level.  Importantly, although Plaintiffs' maps seek to correct the unconstitutionality of the Challenged Districts, they do not alter any of the districts that are not challenged in this lawsuit.  In addition, the individual districts in Plaintiffs' maps are equally if not more compact than those in the City's Remedial Plan, with an equivalent number of splits to the CPAC regions. See Fairfax Report at 59-63, 97.  And, the population deviation between districts in Plaintiffs' maps is less than or equal to that of the City's Remedial Plan.  See id. at 54-57.  In its Reply, the City gives no indication of whether it has a preference among Plaintiffs' proposals nor does the City suggest an alternative remedy if the Court were to find its Remedial Plan to be inadequate.  Notably, while the City criticizes Plaintiffs' proposals, the City does not contend that any of the proposals are themselves unconstitutional or unlawful.  In light of the foregoing, and for the reasons set forth below, the Court finds that Plan 3 is due to be adopted as the Court's Interim Remedial Plan.  Because the Court is convinced that Plan 3 is an appropriate interim remedy, the Court finds it unnecessary to independently devise a new plan.

In accordance with the principles set forth above, the Court finds that Plan 3, shown below, most closely adheres to the legitimate redistricting criteria advocated by the City Council and requested by the public.



See Fairfax Report at 30.  This Plan unites Chimney Lakes and Argyle Forest (unlike Plan 2), it does not divide Springfield or downtown, see, e.g., 11.3.22 Mtg. Tr. at 70, it keeps the Woodstock and surrounding neighborhoods together in District 9 to a greater degree than the Remedial Plan, see, e.g., 11.1.22 Mtg. Tr. at  50, and it keeps Murray Hill, Riverside, Avondale and Ortega together in one District (unlike Plans 1, 2 or the Remedial Plan), a concern so significant that it almost led to the rejection of the Remedial Plan, see, e.g., 11.4.22 Mtg.

Tr. at 199-205.[24]   Plan 3 also keeps San Mateo in District 2 which the Court finds appropriate given the substantial public comment on the issue.   In addition, unlike Plans 1 and 2, Plan 3 uses the same boundary lines for District 12 that the City Council established in the Remedial Plan.   Indeed, the boundaries of both Districts 2 and 12 in Plan 3 are identical to those adopted by the City Council in the Remedial Plan.   While the Court has some concern about the City Council's expressed goal of maintaining District 12 as a rural district, the evidence that this goal improperly perpetuates the effects of the racial gerrymandering is weaker than that pertaining to incumbency.   Given the substantial deference owed the legislature unless the constitution demands otherwise, the Court finds it appropriate to defer to the City Council's policy choices regarding District 12, for purposes of this interim, remedial relief.

Plan 3 also complies with the provision of the Jacksonville City Charter that requires districts to be in as "logical and compact [a] geographic pattern" as possible.   See Jacksonville City Charter § 5.02(a); see also Jacksonville Ordinance Code § 18.101(b)-(c).   In particular, this Plan addresses the illogical shapes of Districts 9, 10, and 14, yielding compact districts that will improve the accountability of the elected representatives, the ability of constituents to

---

[24] Indeed, despite having voted in favor of the Remedial Plan, the councilmember representing Ortega, Riverside and Avondale, informed a local reporter that she hoped the Court would not approve the Remedial Plan.  See Objections, Ex. 11: Andrew Pantazi, Jacksonville City Council passes new district map after racial gerrymandering ruling, The Tributary, Nov. 7, 2022.

organize within their districts, and improve voter access to their representatives. See Preliminary Injunction Order at 72-75, 123. Thus, more so than any other plan before the Court, including the Remedial Plan, the Court finds that Plan 3 adheres to the City Council's own priorities and views of which neighborhoods belong together as communities of shared interests.[25]

To accomplish this, Plan 3 does, however, subordinate the City Council's stated goal of protecting incumbents. The Court acknowledges that this Plan pairs Councilmembers Pittman and Priestly Jackson, who live within two miles of each other, in District 10. And although Gaffney Jr. is not paired with an incumbent in District 8, to the extent he would prefer to run in the district encompassing downtown, he would be paired against DeFoor. But notably, in the prior redistricting cycle, both Priestly Jackson and DeFoor had expressed an intention not to run for reelection in their districts (although Priestly Jackson subsequently filed to run in District 10 again). See Preliminary Injunction

---

[25] The Court notes that while Plan 3 does reduce the overall BVAP percentage in the Packed Districts more than the Remedial Plan, it does not do so dramatically. See Fairfax Report at 135. However, due to the realities of housing segregation in Jacksonville, a significant reduction in that number would likely require reliance on race as the predominant factor in the sorting of those voters. Such action must be left to elected legislators not to a Court acting in a remedial posture. Nevertheless, the greater reduction in the packing of Black voters reflected in Plan 3 is not meaningless. Additionally, by eliminating the effects of prior racial gerrymandering, Plan 3 allows for compact, logical districts that unite neighborhoods with shared interests and will therefore improve the accountability of councilmembers to their constituents. And significantly, by eliminating the district lines drawn on the basis of incumbency, Plan 3 assures that the past racial sorting is not carried forward in future redistricting cycles.

Order at 34 n.22, 64.   Regardless, as explained above, it was the City Council's decision to prioritize incumbency over traditional redistricting criteria that resulted in the perpetuation of the unconstitutional effects of Jacksonville's history of racial gerrymandering.   Plaintiffs' Plan 3 corrects that error but goes no further.[26]   Thus, the Court is convinced that Plan 3 is an appropriate interim remedial plan, such that there is no need for the Court to independently craft a new plan at this time.[27]

The Court is also satisfied that Plan 3 does not violate any other constitutional or statutory requirement.[28]   It is Plaintiffs' position that the VRA

---

[26] Plaintiffs Plan 1 would pair not only two incumbents, it would place three in the same district, unnecessarily disconnecting large swaths of voters from their known representative.

[27] In the Reply, the City includes a footnote with the following: "should the Court rule the [Remedial Plan] constitutional, [the City] request[s] the Court waive any residency requirements that would otherwise exist for individuals seeking election in March 2023."   See Reply at 15 n.8; see also Jacksonville Charter § 5.04.   The City repeats this request in one sentence at the end of its brief.   Id. at 51.   Although the Court has found that the Remedial Plan is not constitutional, it appears that a waiver of the residency requirement may still be warranted.   Nevertheless, the Court declines to address the City's request in the current posture as the scope of the relief the City seeks is unclear.   If the City continues to believe some degree of residency waiver is warranted and requires Court intervention, it should promptly file an appropriate motion requesting this relief.   The Motion should describe the specific terms of the waiver the City requests and include an appropriate memorandum of law addressing the Court's authority to grant the requested relief.

[28] The Court notes that it has considered whether Plan 3 complies with "the constitutional guarantee of one person, one vote under Article I, § 2."   See Abrams, 521 U.S. at 98.   "This provision requires congressional districts to achieve population equality 'as nearly as is practicable.'"   Id.   In Abrams, the Supreme Court instructed that "[c]ourt-ordered districts are held to higher standards of population equality than legislative ones," such that "[a] court-ordered plan should 'ordinarily achieve the goal of population equality with little more than de minimis variation.'"   Id. (citation omitted).   Here, the population deviation in Plan 3 is equal to that of the Remedial Plan, within the range that is generally considered permissible, and under the circumstances of this case, required by legitimate redistricting concerns.   See Fairfax Report at 57; Covington, 283 F. Supp. 3d at 448; see also Brown v. Thomson, 462 U.S. 835, 842

-53-

requires Jacksonville to maintain four districts in which the Black residents have a reasonable likelihood of electing their candidate of choice. See Objections at 42; Fairfax Report, App'x B10. To the extent this is correct, Plaintiffs offer an Expert Report from Kosuke Imai, Ph.D. (Doc. 89-2; Second Imai Report) in which he concludes that in all of Plaintiffs' proposed plans, including Plan 3, "Black voters in [Districts 7, 8, 9, and 10] would be able to elect the candidate of their choice with a high probability." See Second Imai Report at 4-6. Specifically, Imai finds from his racially polarized voting analysis that Black voters in Jacksonville "overwhelmingly support Democratic candidates" and that "under all three proposed plans, Democratic candidates are highly likely to win in these four districts." Id.

While the City critiques Plaintiffs' VRA analysis, it offers no alternative VRA analysis of its own. Moreover, the City does not contend that the VRA may require more than the four Black opportunity districts provided in Plaintiffs' proposals, nor does it argue that Imai's assessment of the effectiveness number is incorrect.[29] Instead, the City appears to take the position that the

_____

(1983) ("Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations.").

[29] The Court acknowledges that Johnson offers various critiques of Imai's racially polarized voting analysis, see Johnson Decl. ¶¶ 65, 204, 223-29, but the City relies on these critiques only to argue against the existence of racially polarized voting in Jacksonville, not that Imai's assessment of the effectiveness number is wrong. See Reply at 45. To the extent Johnson raises critiques that are not discussed in the City's Reply, the Court declines to consider them. The City may not circumvent the page limit requirements by relying on Johnson to raise additional arguments that are not included in their briefing. Moreover, his criticisms would fail to convince the Court that Plan 3 should be rejected.

requirements of <u>Thornburg v. Gingles</u>, 478 U.S. 30, 50-51 (1986) are not met, such that § 2 of the VRA is not even triggered. <u>See</u> Reply at 43-46. The Court need not determine whether the City is correct in its position. If the City is correct, then there is no VRA concern with Plan 3. But if § 2 of the VRA does mandate four Black opportunity districts in Jacksonville as Plaintiffs contend, the only evidence of record demonstrates that the requirement is met.

## V.   Conclusion

The undersigned had no wish to take on the complex and critically important task of determining the boundaries of the City of Jacksonville's electoral map. Such a task is, without a doubt, best left in the hands of officials elected by the citizens. Indeed, as the Supreme Court stated in <u>Abrams v. Johnson</u>, "the task of redistricting is best left to [the legislature], elected by the people and as capable as the courts, if not more so, in balancing the myriad factors and traditions in legitimate districting policies. <u>See</u> <u>Abrams</u>, 521 U.S. 74, 101 (1997). Here, in the Preliminary Injunction Order, the Court determined that Plaintiffs had made a clear showing that their constitutional right to equal protection would be violated by proceeding with an election on the Enjoined Plan, and that such violation could only be averted by the drawing of a new map in advance of another election. Loathe to invade the province of the legislature, the court returned the matter to the City Council to draw a constitutionally appropriate map. But the City's effort to do so was hamstrung

by its failure to address Jacksonville's thirty-year history of racial gerrymandering, the effects of which remain firmly embedded in the Remedial Plan.[30]  Although the Court's findings are necessarily preliminary at this stage in the proceedings, the Court is convinced that the Remedial Plan fails to meaningfully remedy the violation of the voters' equal protection rights.  Thus, at this time there is no plan at all for a municipal election in the City of Jacksonville.

Given the quickly approaching March 2023 election, the undersigned has been left with no option but to accept the unfortunate and difficult task of identifying a constitutionally adequate interim remedial map to govern elections pending the outcome of this litigation.  In attempting to identify an appropriate remedial map, the undersigned considered Plaintiffs' proposed maps and the City's response to them.  As noted, while the City's expert raised criticisms of Plaintiffs' maps, the City made no legal or constitutional challenge to these maps, nor did the City suggest that the Court should reject them entirely if it found the City's Remedial Plan to be inadequate.  Additionally, the Court observes that all of Plaintiffs' maps make greater strides toward remedying the constitutional infirmity of the Enjoined Plan, and appear to

---

[30] Indeed by prioritizing incumbency, instead of remedying the unconstitutional effects of the past gerrymandering, the City Council not only perpetuates the harm in its Remedial Plan, it allows a goal of protecting incumbents subsequently elected on the Remedial Plan to further perpetuate the racial sorting of voters in the next map drawn after the 2030 decennial census.

honor many of the Council's policy choices in various ways in the different proposals. In deference to the legislative prerogative in the redistricting process, and given the time constraint of needing to have a map in place by mid-December, the Court focused its attention on Plaintiffs' proposed maps. The undersigned carefully considered the priorities and policy choices of the councilmembers, the views of the public, and the traditional districting factors, all the while remaining cognizant of the constitutional requirement of equal protection of the laws. Recognizing "that redistricting is an inherently political task for which federal courts are ill-suited," see Upham v. Seamon, 456 U.S. 37, 41-42 (1982), the Court endeavored to make only "minimum change[s]," that is, only such changes as necessary to address the constitutional infirmity of the Remedial Plan, see id. Thus, with the exception of the goal of protecting incumbency, which perpetuated the constitutional infirmity of the Enjoined Plan, the Court sought to respect and adopt the legislative intentions and policy choices as reflected in the legislative history. For the reasons discussed above, after weighing the alternative proposals, the Court has found it appropriate to order that the City proceed with elections on Plaintiffs' proposed Plan 3, the Plan that most closely honors those choices while meaningfully addressing the constitutional violation.

Of course, "[n]o plan of congressional redistricting created by court or legislature will achieve perfection. There are too many practical, political, and

altogether human factors in the equation." <u>See</u> <u>Johnson v. Miller</u>, 922 F. Supp. 1556, 1569 (S.D. Ga. 1995). In selecting Plan 3 at this time, the Court endeavors to address the unconstitutionality of the Enjoined and Remedial Plans and no more. Broader or more systemic changes to the City of Jacksonville's electoral maps are the province of the legislators, not the Court.

In the words of <u>Johnson</u>, "[n]oting again the reluctance with which the task was undertaken," it is

**ORDERED:**

1. Plaintiffs' Objections to the City's Proposed Remedial Plan and Submission of Alternative Plans (Doc. 90) are **SUSTAINED** to the extent set forth in this Order.

2. Plaintiffs' Remedial Plan 3 is **ADOPTED** as the Court's Interim Remedial Plan pending final judgment in this action.

3. Defendants City of Jacksonville and Mike Hogan, in his official capacity as Duval County Supervisor of Elections; as well as their officers, agents, employees, and attorneys who receive actual notice of this Order by personal service or otherwise, are **DIRECTED** to implement the Court's Interim Remedial Plan in Jacksonville City Council and Duval County School Board elections, beginning with the regular 2023 Council and 2024 School Board elections and until entry of a final judgment in this case.

4. City Council districts are paired into School Board districts as follows:

| School Board District | Council District |
|---|---|
| 1 | 1 and 2 |
| 2 | 3 and 13 |
| 3 | 4 and 5 |
| 4 | 8 and 10 |
| 5 | 7 and 9 |
| 6 | 12 and 14 |
| 7 | 6 and 11 |

5. Plaintiffs are directed to **IMMEDIATELY** provide the City with the shapefiles or any other data necessary for the Supervisor of Elections to promptly implement the Court's Interim Plan.

6. The Court's Interim Remedial Plan shall remain in effect pending further Order of the Court.

**DONE AND ORDERED** in Jacksonville, Florida this 19th day of December, 2022.

*Marcia Morales Howard*

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties