In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-14260

————————————————

JACKSONVILLE BRANCH OF THE NAACP,
NORTHSIDE COALITION OF JACKSONVILLE, INC.,
ACLU OF FLORIDA NORTHEAST CHAPTER,
FLORIDA RISING TOGETHER, INC.,
MARCELLA WASHINGTON, et al.,

Plaintiffs-Appellees,

*versus*

CITY OF JACKSONVILLE,
DUVAL COUNTY SUPERVISOR OF ELECTIONS,

Defendants-Appellants.

2                     Order of the Court                     22-14260

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:22-cv-00493-MMH-LLL

_____

Before WILSON, JORDAN, and NEWSOM, Circuit Judges.

BY THE COURT:

In October of 2022, the district court found that the City of Jacksonville, when enacting a districting plan for the City Council, likely created a number of districts that were racially gerrymandered. It issued a preliminary injunction prohibiting the City from using the plan in the March 2023 elections. The City appealed, and sought a stay of the district court's injunction pending appeal. We denied that motion in November of 2022. *See Jacksonville Branch of the NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *5 (11th Cir. Nov. 7, 2022) (*City of Jacksonville I*).

Pursuant to a case management schedule that reflected the City's assertion that a new districting plan had to be in place by December 16, 2022, the district court ordered the City Council to come up with such a plan by November 8, 2022, or indicate that it could not do so. The City Council passed and submitted Ordinance 2022-800-E as a proposed interim remedial plan. The plaintiffs objected and submitted three alternative plans. In a 60-page order issued on December 19, 2022, the district court sustained the

plaintiffs' objections and found that the City Council's proposed interim remedial plan perpetuated the constitutional violations, and adopted one of the plans submitted by the plaintiffs—the one derived from Ordinance 2022-800-E—to be used in the March 2023 elections.

The City appealed, and on December 27, 2022, filed a motion for a stay of the district court's order. It requests (1) "a stay of the district court's order," and (2) "permission to use the City's [proposed interim] remedial plan for all upcoming elections." And it asks us for a ruling by January 6, 2023, "based on discussions" with the supervisor of elections, because "[b]ased on information and belief," the supervisor can implement either of the maps at issue (the one set out in Ordinance 2022-800-E or the one adopted by the district court) if he is given judicial direction by that date. *See* Appellants' Motion at 7-8.

For the reasons which follow, we deny the City's motion for a stay.

# I

In reviewing a motion to stay a preliminary injunction pending appeal, we consider the following factors: "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies." *Robinson v. Att'y Gen.*, 957 F.3d 1171,

1176 (11th Cir. 2020) (citation omitted). The first two factors "are the most critical." *Id.* at 1177. On the first factor, "[i]t is not enough that the chance of success on the merits be better than negligible. . . . By the same token, simply showing some possibility of irreparable injury . . . fails to satisfy the second factor." *Id.* (citation omitted).

The district court, in granting preliminary injunctive relief with respect to the appropriate remedy, did not definitively rule on the merits of the case. Today, we likewise do not conclusively resolve the merits of the City's appeal. Because a preliminary injunction is reviewed under the deferential abuse of discretion standard, *see Benisek v. Lamone*, 138 S.Ct. 1942, 1943 (2018), the narrow question for us is whether the City has made a strong showing that the district court abused its discretion in choosing the appropriate relief.

## II

The Supreme Court has explained that "[t]he whole idea [of a stay] is to hold the matter under review in abeyance because the appellate court lacks sufficient time to decide the merits." *Nken v. Holder*, 556 U.S. 418, 432 (2009). A stay pending appeal has the practical effect of "preventing some action before the legality of that action has been conclusively determined" by "temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct." *Id.* at 428-429. A stay therefore "simply suspend[s] judicial alteration of the status quo[.]" *Id.* at 429.

The plaintiffs contend that the City's motion for a stay is not seeking a return to the status quo that existed before the district court's remedial order but is instead requesting reversal on the merits. We agree because, as things stand, there is no other duly enacted plan that can go into place and would be effective if the district court's order is stayed.

As the City recognizes, the "status quo cannot be the 2011 map because, after the decennial census, that map would violate the Equal Protection Clause's one-person, one vote requirement." Appellants' Reply at 3. And, as the City further acknowledges, the City Council's initial plan is also not the status quo because the district court enjoined that plan and we denied a stay of that ruling in *City of Jacksonville I. See id.* ("The status quo cannot be the City's initially enacted map because, the district court concluded, with detailed findings, that the initial map is substantially likely to violate the Equal Protection Clause.").

That leaves Ordinance 2022-800-E and its proposed interim remedial plan as the only possible plan that could go into effect if the district court's order was stayed. *See id.* at 3-4. By its own terms, however, Ordinance 2022-800-E provides that the proposed interim remedial plan passed by the City Council remains contingent "pending approval by the appropriate court of law." Ordinance 2022-800-E at § 2. To drive the point home, Ordinance 2022-800-E states that the "interim [proposed] redistricting plan set forth in this [O]rdinance shall become effective upon being deemed

constitutional by Court order in [C]ase [No.] 3:22-cv-493-MMH-LLL [i.e., the case pending in the district court]." *Id.* at § 7.

Under Florida law, this contingency is valid, and means that the proposed interim remedial plan set out in Ordinance 2022-800-E does not become effective unless and until it is found to be constitutional by a federal court. *See Lewis Oil Co., Inc. v. Alachua Cnty.*, 496 So.2d 184, 187 (Fla. 1st DCA 1986) ("The effective date of a duly enacted statute or ordinance may be made contingent upon the occurrence of stated conditions in the future, but in that event the statute or ordinance does not become effective until such conditions have been fulfilled. Since the validity of the Alachua County ordinance is dependent upon approval by DER, the ordinance does not become effective as law and cannot be enforced against Lewis Oil until that condition has been fully satisfied.") (citations omitted); *City of Miami Beach v. Lansburgh*, 218 So.2d 519, 522 (Fla. 3d DCA 1969) ("The effective date of the ordinance was contingent on the enabling act 'being a law'[.] Therefore, when Chapter 67-930 did become a law on September 14, 1967, only then and not before then did Ord. No. 1652 become effective as a viable ordinance."). If we stay the district court's order—i.e., if we prevent that order from going into effect pending appeal—the status quo ante contains no plan that will immediately go into effect in place of the court's chosen plan.

In order for the proposed interim remedial plan set out in Ordinance 2022-800-E to go into effect, we would have to do more—much more—than simply stay the district court's order.

We would have to hold on the merits that the City Council's proposed interim remedial plan is constitutional. Such a determination would be a ruling on the merits of the City's appeal, and an order on a motion for stay pending appeal is not a resolution of the appeal itself. *See, e.g., Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020); *Hassoun v. Searls*, 976 F.3d 121, 125 (2d Cir. 2020); *Nat'l Urb. League v. Ross*, 977 F.3d 698, 700-01 (9th Cir. 2020). That is why an order issued by a motions panel is not binding on a subsequent merits panel. *See* 11th Cir. R. 27-1(g).

The City does not come to grips with the contingency language of Ordinance 2022-800-E. It says in a footnote that the City Council was simply trying to comply with the district court's order when enacting a proposed interim remedial plan. *See* Appellants' Reply at 4 n.1. But the City does not deal with the legal effect, under Florida law, of the language in § 7 of Ordinance 2022-800-E declaring that the proposed interim remedial plan will become effective "upon being deemed constitutional" by a federal court. By asking us to rule that Ordinance 2022-800-E is constitutional, and to put it in place, the City is essentially requesting a ruling on the merits of its appeal, and not merely a stay of the district court's remedial order.

## III

In an abundance of caution, we also address likelihood of success, the first prong of the stay standard. We conclude that the City has not made a strong showing that it is likely to succeed on

the merits of its appeal. Given the short time we have had to draft this order, our analysis is necessarily brief, and we repeat that we are not making any pronouncements on the merits of the City's appeal.

It is true, as the City says, that a federal court must presume that a remedial districting plan enacted by a state or municipality after a finding that a previous plan was unconstitutional is entitled to a "presumption of legislative good faith." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (holding that the district court erred by requiring the state to prove that its subsequent remedial plan had "cured any taint" from the previous unconstitutional plan). But that principle, important as it is, does not mean that the presumption is irrebuttable such that all subsequently enacted remedial plans are deemed valid. Indeed, in the same year that the Supreme Court decided *Abbott*, it held in another case that a district court did not abuse its discretion in concluding that a subsequent remedial plan enacted by the state still contained racially-gerrymandered districts, and approved the use of a special master to draw new districts in place of those which had been racially gerrymandered and in which the plaintiffs resided. *See North Carolina v. Covington*, 138 S. Ct. 2548, 2553-54 (2018).

Based on the district court's order, and our limited review of the extensive and fact-intensive record, we cannot say that the City has shown a strong likelihood of success on the merits. First, the district court applied the correct standard. Citing and quoting the Supreme Court's decision in *Covington*, 138 S. Ct. at 2554, the

district court acknowledged the deference due to the City Council's proposed interim remedial plan, but also recognized its independent obligation to decide whether that plan was constitutional and corrected the defects which rendered the initial plan unlawful. *See* D.E. 101 at 35. Second, based on what we have been able to review and digest in the short time available since the motion to stay was filed, the City has not made a strong showing that the district court's factual findings about racial gerrymandering in the proposed interim remedial plan are clearly erroneous. *See generally Cooper v. Harris*, 137 S. Ct. 1455, 1468 (2017) (holding that a district court's findings that a state's redistricting plan for two congressional districts constituted racial gerrymandering are reviewed for clear error).

## IV

The City's motion for a stay pending appeal is denied.

**MOTION FOR STAY DENIED.**

Newsom, Circuit Judge, dissenting:

I would grant the stay.  In its order enjoining the City's interim redistricting map—which the City Council adopted (by a 16-1 margin) to remedy constitutional infirmities in an earlier plan—the district court committed, it seems to me, several interrelated errors:  (1) It absolved the map's challengers of any obligation to show that the City acted with the required discriminatory intent; (2) it invalidated the interim map based solely on what it said were previous maps' lingering discriminatory "effects"; and (3) it failed to accord city officials the presumption of "good faith" to which the law entitles them.

## I

The law that governs equal-protection challenges to redistricting plans is clear.  For present purposes, three propositions are particularly important.  *First*, most fundamentally, it has been settled for nearly 50 years that a plaintiff seeking to make out a violation of the Equal Protection Clause—including one allegedly arising out of a redistricting effort—must prove that the public officials whose conduct he challenges acted with discriminatory *intent*, not just that their conduct had discriminatory *effects*.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*, 426 U.S. 229, 238–45 (1976).  That is, the Supreme Court has clarified, the plaintiff must show that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group."  *Personnel Admin'r of Mass. v.*

*Feeney*, 442 U.S. 256, 279 (1979). With respect to redistricting, in particular, a plaintiff seeking to establish the required "because of" intent must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).[1]

*Second*—and this much should go without saying—"[w]henever a challenger claims that a . . . law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the [government]." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). And as the Supreme Court has emphasized, because redistricting is "primarily" a state responsibility, and because "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions," attention to the challenger's burden "takes on special significance in districting cases." *Id.*

---

[1] One clarification at the outset: The plaintiffs assert that "intentional discriminatory animus" and "racial gerrymandering" are "entirely different legal theor[ies]." Appellees' Resp. in Opp. at 16 & n.7. But proof of racial gerrymandering *requires* proof of intentional discrimination. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018) ("'The Equal Protection Clause forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification."). Whether plaintiffs use "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both," to establish racial gerrymandering the legal claim is the same, and their burden remains to show that "race was the predominant factor motivating the legislature's decision." *Cooper*, 137 S. Ct. at 1463–64.

22-14260                Newsom, J., dissenting                3

(quoting *Miller*, 515 U.S. at 915). Accordingly, and significantly for present purposes, "[t]he Supreme Court has instructed that when a court assesses whether a duly enacted statute"—or, as here, a city ordinance—"is tainted by discriminatory intent, 'the good faith of the'" legislative body whose conduct is being assailed as unconstitutional "must be presumed." *League of Women Voters of Fla., Inc. v. Florida Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (quoting *Perez*, 138 S. Ct. at 2324).

Finally, and also importantly here, the Supreme Court has clarified that the challenger's burden to prove discriminatory intent and "the presumption of legislative good faith are *not* changed by a finding of past discrimination." *Perez*, 138 S. Ct. at 2324 (emphasis added). Because "'[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful' . . . [t]he 'ultimate question remains whether a discriminatory intent has been proved in a given case'" with respect to the particular policy at issue. *Id.* at 2324–25 (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)). While it is of course true that "[t]he 'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent," the Court has flatly rejected any suggestion that the existence of past discrimination alters the otherwise applicable standards or burdens of proof. *Id.* at 2325 (quoting *Arlington Heights*, 429 U.S. at 267).

## II

The district court violated these foundational principles. The court's order gives no indication that it found that the City's

remedial map—as opposed to either the plan that the court had earlier enjoined or the predecessor 2011 map—was predominantly motivated by race. And so far as I can tell, there is little (if any) evidence that racial considerations "predominant[ly] motivat[ed]" the makers of the remedial map. Nor does the court's order so much as suggest that it presumed city officials' good faith—*i.e.*, their *non*-discriminatory intent—in adopting the remedial plan. Every indication, in fact, is to the contrary—that the court presumed (without justification) that in adopting the remedial plan, the officials acted with the discriminatory intent that the court found had infected earlier redistricting efforts.

## A

All seem to agree about the basic facts here. After the district court invalidated and enjoined the City's 2022 map as a racial gerrymander, the City went back to the drawing board and crafted an interim remedial plan to govern the March 2023 council elections. So far as I can tell, the following facts about that interim plan are undisputed: (1) The City's interim map is the result of new legislation; (2) the City hired a new redistricting expert, Dr. Douglas Johnson, to draw the interim map; (3) Johnson and his team drew the new council districts from scratch; (4) the mapmakers didn't "look at race at all when [they] were drawing" the interim map, Doc. 101 at 8; (5) the interim map "improve[d] the average compactness" of the challenged districts and eliminated "many of the more egregious hooks, claws, and divots" that plagued the original plan, *id.* at 27; (6) the mapmakers aimed to group similar neighborhoods

together (*e.g.*, rural with rural and urban with urban) and to respect preexisting boundaries, both natural (*e.g.*, rivers) and manmade (*e.g.*, interstate highways); and (7) the mapmakers aimed to maintain the partisan makeup of one district and, perhaps above all else, to avoid direct election contests between incumbents.

## B

The district court acknowledged—and in any event, certainly didn't dispute—any of these facts. *See, e.g.*, Doc. 101 at 38–39 (acknowledging that de facto "housing segregation in Jacksonville is an undeniable fact," meaning that "most Black residents in northwest Jacksonville would reside in the geographic areas that comprise" the allegedly "packed" districts). Even so, it concluded that, in adopting the interim map, the City Council "prioritized criteria that were predestined to perpetuate, rather than correct, the preexisting racial gerrymandering of the City Council districts." *Id.* at 40. In particular, the court fixated on the "high priority the City placed on protecting incumbents and candidates during the redistricting process, and relatedly, maintaining the Council's partisan balance." *Id.* But the court acknowledged, as it had to, that protecting incumbents is generally a permissible redistricting objective. *See id.* at 44–46; *see also, e.g.*, *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015) (observing that "incumbency protection" is one of several "traditional race-neutral districting principles"). And it even acknowledged that "avoiding the pairing of incumbents" in head-to-head races against one another—one of

the City's major emphases here—is an even "less problematic form of incumbency protection."  Doc. 101 at 45 n.22.

Conspicuously, though, the district court never assessed the key question underlying the plaintiffs' equal-protection challenge: It never found—or even insinuated—that the interim plan was itself the product of *intentionally* discriminatory decisionmaking. That is, it never suggested that the City Council prioritized incumbency protection "because of"—rather than "in spite of"—its racial effects.  Nor did it ever find—or even insinuate—that there was any basis for rebutting the presumption that councilmembers who adopted the interim plan were acting in good faith and for non-discriminatory reasons.  To the contrary, the court simply concluded that by prioritizing incumbency, "the City all but guaranteed that the unconstitutional *effects*" of the earlier plans "would be carried forward into the [r]emedial [p]lan."  *Id.* at 47 (emphasis added).  Indeed, the district court's order fixates—exclusively, and I think impermissibly—on what it repeatedly describes as the lingering "effects" of previously invalidated and enjoined plans, and it concludes by observing that "the effects of the prior racial gerrymandering . . . remain present" in the interim remedial plan.  *Id.* at 46–47; *see also, e.g., id.* at 38 ("the effects of the racial gerrymandering" evident in prior plans); *id.* ("the harmful effects of the City's decades-long history of racial gerrymandering"); *id.* ("the effects of the City's prior over-emphasis on race").  To be sure, there is nothing inherently wrong with inquiring into a policy's effects—as one of several sources of circumstantial evidence for a policy's

underlying intent. *See Arlington Heights*, 429 U.S. at 264–68. But the district court never conducted a proper *Arlington Heights* analysis; instead, it focused on what it viewed as discriminatory effects in their own right. *See, e.g.*, Doc. 101 at 46–47 ("Plaintiffs' circumstantial evidence demonstrates that the effects of the prior racial gerrymandering . . . remain present in the Remedial Plan.").

In forsaking any serious inquiry into intent and instead satisfying itself with a consideration of effects, the district court found it dispositive that the City Council prioritized incumbency protection despite the fact that councilmembers "hold office 'by virtue of their election in an unconstitutionally racially gerrymandered district.'" *Id.* at 44 (quoting *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting)). "[I]n th[at] remedial posture and given the historical record" before it, the district court held that the City Council's "desire to protect incumbents who had been elected to racially gerrymandered districts 'must give way to its duty to completely remedy the constitutional violation.'" *Id.* at 46 (quoting *Covington v. North Carolina*, 283 F. Supp. 3d 410, 433 (M.D.N.C. 2018)).

The unstated premise of the district court's order seems to be that when considering a redistricting map adopted to remedy a previously invalidated plan, the usual rules no longer apply. The legislators' good faith is not presumed. *But see, e.g.*, *Perez*, 138 S. Ct. at 2324; *League of Women Voters*, 32 F.4th at 1373. The challenger need not prove "because of" discriminatory intent. *But see, e.g.*, *Perez*, 138 S. Ct. at 2324; *Davis*, 426 U.S. at 238–45. A showing

of "in spite of" discriminatory effect is enough.  *But see, e.g.*, *Davis*, 426 U.S. at 238 – 45; *Feeney*, 442 U.S. at 279.  And the taint of "original sin" persists.  *But see, e.g.*, *Perez*, 138 S. Ct. at 2324; *Bolden*, 446 U.S. at 74.

I disagree.  I freely acknowledge that the Supreme Court has not yet squarely addressed whether and to what extent the usual rules carry over to the consideration of interim remedial plans like the one before us.  But I think *Perez* gets pretty close.  The map at issue in that case *was* "remedial" in a manner of speaking.  It came into being essentially as follows:  Following the 2010 census, the Texas Legislature in 2011 drew new congressional and state-legislative districts.  Following litigation challenging those plans as (among other things) unlawful racial gerrymanders, a Texas-based federal district court drew its own "interim" maps that "departed significantly from the State's 2011 plans."  138 S. Ct. at 2316.  In 2013, hoping to avoid further litigation, the state "repealed the 2011 plans and enacted the Texas [district] court's interim plans" as its own, "with just a few minor changes."  *Id.* at 2317.  Several years later, the district court invalidated the state's 2013 maps—the same ones that the court had initially crafted as interim measures—on the ground that "the discriminatory intent allegedly harbored by the 2011 Legislature [should be] attributed . . . to the 2013 Legislature because it had failed to 'engage in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'"  *Id.* at 2318.

It was against that backdrop—the state legislature having adopted interim districting maps to remedy previously invalidated plans—that the Supreme Court said and held what it did in *Perez*. To repeat briefly: (1) A plaintiff challenging a districting map as a racial gerrymander bears the burden of proving that the legislature acted with discriminatory intent; (2) the legislature's good faith (*i.e.*, its non-discriminatory intent) must be presumed; and critically, (3) any discriminatory intent that might taint an earlier plan is not carried forward to later maps, but must be proved anew. *See id.* at 2324–26. Even in the posture of the case before it, the *Perez* Court clarified that a legislative body is "not obligated to show that it ha[s] 'cured' [whatever] unlawful intent" might have marred its earlier redistricting efforts, *id.* at 2313, and that it remains the "plaintiffs' burden to overcome the presumption of legislative good faith and show" that the particular plan at issue—here, the remedial map—is infected "with invidious intent," *id.* at 2325. Until the Supreme Court says otherwise—that is, tells us that the usual rules don't apply to remedial redistricting plans—I would hew closely to *Perez*.

## III

Before I conclude, a few words about the plaintiffs' principal counterarguments. First, and most conspicuously, the plaintiffs invoke the Supreme Court's summary affirmance in *North Carolina v. Covington*, 138 S. Ct. 2548 (2018), which they say "is on all fours" here. Appellees' Resp. in Opp. at 12. And to be fair, the procedural postures of that case and this one are indeed pretty close. There,

as here, a federal court invalidated a redistricting plan and ordered a legislative body to "draw remedial maps" and "file [them] in the [court] for approval," the legislative body did so, a group of plaintiffs challenged the remedial plan on the ground that four districts "still segregated voters on the basis of race," and the court then invalidated the remedial map. *See Covington*, 138 S. Ct. at 2550. But in its summary disposition, the Supreme Court didn't purport to change the law that governs challenges to redistricting plans. It didn't signal a retreat from *Perez*, it didn't walk back the presumption of good faith, and it certainly didn't suggest that effects-only proof would suffice to make out an equal-protection claim. Instead, the Court simply concluded, on the record before it, that the district court's "factfinding [had] turned up sufficient circumstantial evidence that race was the predominant factor governing the shape of th[e] four districts" that the plaintiffs there had challenged. *Id.* at 2553. To be clear, the problem here isn't just that the circumstantial evidence of intent is weaker than it was in *Covington*,[2] but

---

[2] I think it is, for two reasons. First, the legislature there "relie[d] on redistricting criteria closely correlated with race in its pursuit of the far more suspect goal of seeking to ensure that incumbents elected in a racially gerrymandered district prevail in their remedial district." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 433 (M.D.N.C. 2018). Here, by contrast, the City's remedial plan really only sought to protect one incumbent outright. Rather, as the district court acknowledged, "the focus on incumbency appears to have been about ensuring that incumbents, or their preferred candidates, would not have to run against each other." Doc. 101 at 37 n.17.

Second, the division along racial lines was far starker there than it is here. Senate District 21 in that case was a "horseshoe-shaped section of the

also that there is no indication in the district court's opinion *that it applied the correct legal standards*.

Second, following the plaintiffs' lead, the district court pointed to a footnote in Justice Thomas's dissenting opinion in *Easley v. Cromartie*. *See* Doc. 101 at 44. With respect, it's a pretty thin reed on which to base a rejection of the interim map's constitutionality. All Justice Thomas said there was this: "I assume, because the District Court [in that case] did, that the goal of protecting incumbents is legitimate, even where, as here, individuals are incumbents by virtue of their election in an unconstitutionally racially gerrymandered district." 532 U.S. at 262 n.3 (Thomas, J., dissenting). To be sure, he called that a "questionable" assumption, but he expressly declined to pursue the matter because "the issue was not presented in th[at] action." *Id.* That, to my mind, is no basis for second-guessing the Supreme Court's later—and more closely on point—*majority* opinion in *Perez*.

---

city of Fayetteville" that included the black neighborhoods but excluded the white ones." *Id.* at 436. Senate District 28 encompassed the black neighborhoods of Greensboro but "exclude[d] predominantly white sections of Greensboro." *Id.* at 438. House District 21 "separate[d] the predominantly black areas of Clinton from the predominantly white areas by splitting a precinct on racial lines"—and was accomplished by a "protrusion stretching" out from the core of the district. *Id.* at 439. Here, by contrast, the district court found that "the more egregious hooks, claws, and divots in the lines of the [previously enjoined] have been removed or regularized." Doc. 101 at 27. And those that remained, the court observed, were dictated by incumbents' residences rather than an effort to ensure districts' political makeup. *Id.* at 43.

Finally, I readily acknowledge that the Supreme Court in *Perez* noted that the legislature in that case had not "use[d] criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature." 138 S. Ct. at 2325. Perhaps—*perhaps*—that is reason enough to discount everything else the Court said and held there. But it's tough to tell what role the Court's observation—which was just one of a series of observations that it made about the particular circumstances of that litigation—played in its ultimate decision, and so I'm reluctant to invest it with talismanic significance. Better, it seems to me, to stick with the foundational legal principles that the Supreme Court clearly embraced, and to leave it to that Court to tell us if it meant by that statement to create some sort of carve-out.

*   *   *

The bottom line for me: As I read its order, the district court here declared a duly enacted redistricting plan unconstitutional (1) without indulging (or even acknowledging) the presumption that legislators who adopted it acted in good faith, (2) without requiring the plan's challengers to prove that the legislators harbored discriminatory intent, and (3) by concluding only that the map would perpetuate discriminatory effects. Had the district court properly considered the legislators' intent, it couldn't—on this record—have found that they were "predominant[ly] motivat[ed]" by a desire to discriminate on the basis of race. It therefore seems to me substantially likely that the City will succeed in its defense of its plan. And because a legislative body's "inability to enforce its duly enacted

plans clearly inflicts irreparable harm," *Perez*, 138 S. Ct. at 2324 n.17, I would grant the City the stay it requests.[3]

I respectfully dissent.

---

[3] One final housekeeping matter—not that it much matters, since I'm writing in dissent:  The plaintiffs insist that because the City Council initially framed its ordinance in such a way that the remedial map "shall become effective" only "upon being deemed constitutional" by the district court, Doc. 74-1 at 9, and because the district court didn't "deem[ the map] constitutional," the map doesn't exist—and, accordingly, that the entry of a stay by this Court would, in effect, leave no map in place.  An order directing the district court to "deem[]" the remedial plan constitutional would, the plaintiffs say, reverse that court's decision on the merits, rather than preserve the status quo.  I see the point—and the complexity that it flags—but I think it's overblown.  We don't need to order the district court to "deem[]" the remedial map constitutional.  The City Council voluntarily assumed the condition that the map be approved in advance—it didn't have to do so, *see* Doc. 53 at 137-39 (the preliminary injunction)—and it can just as easily remove that condition.  Indeed, its authority to remove the condition was part of the status quo before the district court acted.  And, having sought a stay from this Court, there's no reason to think that the City Council wouldn't remove the condition now if given the opportunity.  I would thus grant the stay with the stipulation that it would automatically dissolve if the City Council didn't remove the condition on the remedial map's effective date within three business days.